Judge STRAUB dissents in a separate opinion.
RAGGI, Circuit Judge.
Zhou Yun Zhang, a citizen of the People’s Republic of China, petitions for review of the June 3, 2002 decision of the Board of Immigration Appeals (“BIA” or “Board”) rejecting his claims for asylum and withholding of deportation.[1] In dismissing Zhang’s appeal, the BIA agreed with the Immigration Judge (“IJ”) who presided over the underlying exclusion hearing that Zhang had “not presented consistent, detailed or credible testimony” to support his claim of persecution based on his opposition to China’s family planning policies. In re Zhang, unpublished decision at 2 (B.I.A. June 3, 2002) (hereinafter “BIA Decision”). The BIA concluded that Zhang’s testimony, of “limited credibility and lacking in detail, combined with the few [corroborating] documents” offered in evidence, were insufficient to establish eligibility for relief. Id. Zhang submits that neither the adverse credibility finding nor the sufficiency conclusion is supported by substantial evidence. We disagree and, accordingly, deny the petition for review.
1. Factual Background
A. Zhang’s Illegal Entry
On January 21, 1993, Zhou Yun Zhang attempted to enter the United States at John F. Kennedy International Airport.[2] Lacking proper documentation, Zhang was denied admission and charged with exclud-ability. See 8 U.S.C. § 1182(a)(6), (7) *68 (Supp. V 1993). An exclusion hearing before an IJ was scheduled for May 11,1993.
B. Zhang’s Initial Application for Asylum
On April 15, 1993, approximately one month before his scheduled hearing, Zhang filed a pro se application for asylum and withholding of deportation, asserting that he feared forcible sterilization by the Chinese government for his past violation of China’s family planning policies. He stated that he and his wife had two children: a daughter born in 1988, and a son born in 1992. After the birth of the Zhangs’ son, family planning officials fined the couple for exceeding China’s one-child-per-family limit and gave them a deadline to submit to sterilization. Zhang stated that he fled China to avoid forcible sterilization.
Despite filing this application for relief from exclusion, Zhang failed to appear for the scheduled May 11, 1993 hearing, prompting the Immigration and Naturalization Service (“INS”) to close his asylum/withholding application without prejudice. Zhang’s whereabouts were apparently unknown to the INS for approximately five years when, on April 8, 1998, Zhang, through counsel, requested to have his application reopened. The INS agreed and scheduled his exclusion hearing for July 1, 1998.
C. Zhang’s 1998 Amended Asylum Application
In anticipation of his July 1998 hearing, Zhang filed an amendment to his initial asylum/withholding application. In that June 24, 1998 amendment, Zhang reiterated that he fled China for fear of forcible sterilization and added that, since his departure from China, government officials had forcibly sterilized his wife.[3] Providing further personal background to these events, Zhang stated that he and his wife were married in a traditional ceremony in 1988, but because they were both in their early twenties, i.e., below the legal age to marry, they could not obtain a marriage certificate. As a result, when their daughter was born the following year, local officials required the couple to pay a monetary fine for not having a marriage certificate and for conceiving a child without permission. When Zhang’s wife again became pregnant in 1992, the couple feared she might be required to submit to an abortion; accordingly, they arranged for her to go into hiding with a relative who lived in another part of the country. After Zhang’s son was born on December 13, 1992, family planning officials directed that his wife be sterilized. Because she was too weak from childbirth to undergo the procedure, the officials ordered that Zhang be sterilized instead. Zhang stated that he was frightened by the prospect of involuntary sterilization and, therefore, fled to the United States, arriving on January 21, 1993. He further asserted that when Chinese officials discovered Zhang’s departure, they imposed a monetary fine on his wife and then forcibly sterilized her on June 5, 1993.

D.The Hearing Before the Immigration Judge

1. Zhang’s Testimony and Evidence
On July 1, 1998, a hearing was held before an IJ on the excludability charges *69 against Zhang as well as on his application for political asylum and withholding of deportation. Because Zhang, through counsel, conceded éxeludability at the outset of the hearing, the focus of the proceeding was on Zhang’s eligibility for relief from exclusion.
As the sole hearing witness, Zhang, testifying through an interpreter in the Foo Chow dialect, expanded on the events outlined in his 1993 asylum application and the 1998 amendment to that application. He testified that he fled China shortly after the birth of his second child because the government had notified him to report for sterilization. Zhang stated that sometime after his arrival in the United States, he spoke by telephone with his wife in China, who reported that she had been forcibly sterilized. Although Zhang, on occasion, testified quite clearly that the date of this procedure was June 5, 1993, other parts of his testimony suggested that the alleged sterilization had occurred earlier.
Notably, in first recounting his telephone conversation with his wife, Zhang reported her telling him that “not long after the — -giving birth of the baby” (the birth having taken place on December 13, 1992) five or six people, some of whom were government officials, had come to the house and told Zhang’s wife she would have to be sterilized. Hearing Tr. at 16. When his wife asked the officials for more time because she was still weak from childbirth, they purportedly refused her request and insisted that the procedure take place that day. The IJ asked a series of questions to clarify the date of this conversation between Zhang and his wife as it pertained to when the alleged sterilization had occurred. Zhang replied that the conversation had occurred approximately one month after his arrival in the United States. When the IJ asked if this meant the conversation had taken place in February 1993, Zhang initially replied affirmatively. Later, however, he placed the conversation sometime in July 1993, consistent with the June 5, 1993 date that was reflected on a sterilization certificate offered in evidence.
In addition to this sterilization certificate, Zhang offered into evidence documents that he testified were his notarial birth certificate, his marriage certifícate, a copy of his family’s household register, issued on October 27, 1997, and a receipt for the cash fine paid by his wife after Zhang’s departure from China, dated May 12, 1993. Zhang testified that he had asked his wife to send these documents from China and that he had received them on June- 20, 1998, shortly before the hearing. Zhang also submitted a studio photograph of a woman and two children, whom he identified as his wife and children. He testified that the photograph had been sent to him sometime in 1996.
2. The Immigration Judge’s Decision
' At the conclusion of the hearing, the IJ rendered a detailed oral decision denying Zhang’s asylum and withholding application and ordering his exclusion and deportation. In so ruling, the IJ identified Zhang's credibility as the central factor in evaluating his persecution claim. The IJ observed that in some cases, the only available evidence to support an applicant’s subjective fear of persecution .may be his own testimony, and he correctly acknowledged that such evidence can suffice to carry an applicant’s burden “where the testimony is believable, consistent and sufficiently detailed to provide a plausible and coherent account of the basis for the applicant’s fears.” In re Zhang, unpublished decision at 4 (Immig.Ct. July 1, 1998) (hereinafter “IJ Decision”); see Diallo v. *70 INS, 232 F.3d 279, 285 (2d Cir.2000). In this case, however, the IJ found that Zhang’s account was not believable largely because of confusing, inconsistent, and conflicting responses regarding the circumstances of his wife’s alleged involuntary sterilization. After carefully reviewing the troubling inconsistencies, the IJ concluded, “[i]t is the opinion of the Court that this seriously undermines the applicant’s truthfulness and credibility before the Court with regard to the forced sterilization of his spouse.” IJ Decision at 8.
The court further noted that it gave little weight to Zhang’s supporting documentary evidence because it either conflicted with aspects of his own testimony, as in the case of the sterilization certificate, or was not contemporaneous. The IJ suggested that copies of the children’s birth certificates or photographs showing Zhang with his family in China would have been more probative of his claimed family relationship than a family register prepared or photograph taken after his departure. The IJ also noted that Zhang’s documentary corroboration did not include affidavits from persons with direct knowledge of the events and circumstances giving rise to his claim, such as his wife, certainly “the best person to offer information” regarding the alleged forcible sterilization. Id.
E. The BIA Decision
Proceeding pro se, Zhang challenged the IJ’s decision to the BIA, which dismissed his appeal on June 3, 2002, holding that Zhang had not adduced sufficient credible evidence to meet his burden of proof regarding eligibility for asylum or withholding of deportation. Specifically, the Board concluded that “important discrepancies” in the record identified by the IJ “are indicative of an overall lack of veracity” on Zhang’s part. BIA Decision at 1. Noting that the IJ had also highlighted Zhang’s failure to produce supporting documentation for his claims, the BIA specifically reiterated that in cases where an applicant’s testimony may be the only evidence available to support an asylum claim, such testimony can suffice if it is “believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his alleged fear.” Id. at 2 (citing Diallo v. INS, 232 F.3d at 279). That, however, was not this case. The BIA agreed with the IJ that Zhang had “not presented consistent, detailed or credible testimony.” Id. Thus, the BIA concluded, “[w]e simply cannot find the testimony, of limited credibility and lacking in detail, combined with the few documents, provide[s] sufficient evidence to meet the overall burden of proof.” Id.
This petition for review followed.
II. Discussion
A. Eligibility for Asylum and Withholding of Removal
In a world inhabited by more than six billion people, most of whom live in societies that we in the United States would consider oppressive for a variety of reasons, it is hardly surprising that thousands of refugees continue to present themselves at our borders each year seeking asylum. To qualify for asylum under the Immigration and Nationality Act (“INA”), a refugee must demonstrate past persecution or a well-founded fear of future persecution on account of “race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101(a)(42); see 8 U.S.C. § 1158(a) (1993) (codified at 8 U.S.C. § 1158(b)(1), as of April 1, 1997); see also Jin Shui Qiu v. Ashcroft, 329 F.3d 140, 148 (2d Cir.2003). Even if an applicant establishes his eligibility for asylum, however, the Attorney General retains discre *71 tion whether to grant the request. See Ramsameachire v. Ashcroft, 357 F.3d 169, 178 (2d Cir.2004).
A claim for withholding of deportation is factually related to an asylum claim, but the applicant bears a heavier burden of proof to secure the former relief. He must demonstrate that, if returned to his country, his life or freedom would in fact be threatened on one of the protected refugee grounds. See 8 U.S.C. § 1253(h)(1) (1993) (codified at 8 U.S.C. § 1231(b)(3)(A), as of April 1, 1997). If the applicant carries this burden, however, the Attorney General is obliged to grant the relief sought. See Ramsameachire v. Ashcroft, 357 F.3d at 178. Because the two forms of relief are factually related but with a heavier burden for withholding, it follows that an applicant who fails to establish his eligibility for asylum necessarily fails to establish eligibility for withholding. See id. at 178, 183; see also Abankwah v. INS, 185 F.3d 18, 22 (2d Cir.1999). That is Zhang’s case; accordingly, our discussion will focus on his claim for asylum.
Because refugees frequently leave their native countries under urgent circumstances, the law recognizes that in some asylum cases, the only evidence of persecution an applicant may be able to offer will be his own testimony. Accordingly, such testimony, if credible, may be sufficient to sustain the burden of proof. See 8 C.F.R. § 208.13(a); see also Diallo v. INS, 232 F.3d at 285 (recognizing that “consistent, detailed, and credible testimony may be sufficient to carry the alien’s burden”). Nevertheless, where the circumstances indicate that an applicant has, or with reasonable effort could gain, access to relevant corroborating evidence, his failure to produce such evidence in support of his claim is a factor that may be weighed in considering whether he has satisfied the burden of proof. See Diallo v. INS, 232 F.3d at 285 (holding that “evidence corroborating his story, or an explanation for its absence, may be required where it would reasonably be expected”); see also Jin Shui Qiu v. Ashcroft, 329 F.3d at 153 (noting that rejection of asylum claim for lack of corroboration requires IJ and BIA (1) to identify particular corroborating evidence that is lacking, and (2) to show that such evidence was reasonably available to the applicant).
B. Asylum Claims Based on a Spouse’s Forcible Abortion or Sterilization
In 1996, Congress extended the definition of political refugee, for purposes of asylum and withholding claims, to persons subjected to forced abortions or sterilizations. See IIRIRA § 601(a)(1), 110 Stat. at 3009-689 (amending 8 U.S.C. § 1101(a)(42));[4] see also Ke Zhen Zhao v. U.S. Dep’t of Justice, 265 F.3d 83, 91-92 (2d Cir.2001) (discussing background to change in the law). The following year, the BIA interpreted the new provision to permit the husband of a woman subjected to forced abortion or sterilization to base his own asylum claim on such past spousal persecution. See In re C-Y-Z-, 21 I. & N. *72 Dec. 915, 918 (B.I.A.1997), cited in Jin Shui Qiu v. Ashcroft, 329 F.3d at 148; see also Ke Zhen Zhao v. U.S. Dep’t of Justice, 265 F.3d at 92. Indeed, a husband may apply for asylum or withholding of deportation based on past spousal persecution even when his wife remains in their native country. See In re C-Y-Z-, 21 I. & N. Dec. at 916.
This expansion of the concept of “refugee,” coupled with the law’s recognition that some asylum claims cannot be corroborated, presents significant challenges in distinguishing valid from invalid claims of persecution based on China’s coercive population control policies.[5] After all, virtually any young, undocumented Chinese male seeking to enter the United States can assert that he is married and seeking asylum based on his spouse’s forcible abortion or sterilization. Some such claims may be true, even though the man can produce no supporting documentation. Others may be bogus, although corroborated by a host of meticulously forged documents. Such claims can present an almost infinite variety of circumstances, from men whose claims of marriage and persecution are entirely fabricated; to men whose wives did have documented abortions or sterilizations, but not involuntarily; to men who use their wives’ involuntary abortions or sterilizations as an excuse to abandon family responsibilities.
Further complicating agency review of such claims is the reality that large numbers of Chinese males annually flee their country in search of better economic opportunity. See, e.g., Elisabeth Rosenthal, Chinese Town’s Main Export: Its Young Men, N.Y. Times, June 26, 2000, at A1 (reporting that 80% of the male population between ages 20 and 40 had left the Chinese village of Ting Jiang over a ten-year period). This economic motivation is certainly understandable, indeed, historic, and the men’s strong determination is evidenced by the high costs many pay, both in terms of money and lives. See id. (reporting that human smugglers are frequently paid as much as $70,000 per person to make travel arrangements out of China);[6] see also United States v. Lee Peng Fei, 225 F.3d 167, 169-70 (2d Cir. 2000) (detailing events leading to deaths of ten Chinese nationals being smuggled into the United States aboard the Golden Venture ). Economic motives alone, however, cannot qualify an alien for asylum pursuant to 8 U.S.C. § 1101(a)(42); thus, men with such motives may have an incentive to fabricate spousal persecution claims to *73 enhance the likelihood of their admission into the United States.
However difficult the problems of identifying legitimate spousal persecution claims, we are obliged to defer to the BIA’s interpretation of § 1101(a)(42). See Diallo v. INS, 232 F.3d at 285 (noting that pursuant to Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), federal courts accord substantial deference to the BIA’s interpretations of the statutes and regulations that it administers). Thus, we must apply the same substantial evidence standard of review to spousal persecution claims that we apply to direct persecution claims.
C. Standard of Review
In reviewing asylum determinations, we defer to the factual findings of the BIA and the IJ if they are supported by substantial evidence. See Wu Biao Chen v. INS, 344 F.3d 272, 275 (2d Cir. 2003) (per curiam). Under this standard, “we will not disturb a factual finding if it is supported by ‘reasonable, substantial, and probative’ evidence in the record when considered as a whole.” Id. (quoting Diallo v. INS, 232 F.3d at 287). Indeed, we must uphold an administrative finding of fact unless we conclude that a reasonable adjudicator would be compelled to conclude to the contrary.[7] See id. at 275-76 (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)); see also Ramsameachire v. Ashcroft, 357 F.3d at 177; Diallo v. INS, 232 F.3d at 287.
When a factual challenge pertains to a credibility finding made by an IJ and adopted by the BIA, we afford “particular deference” in applying the substantial evidence standard, Montero v. INS, 124 F.3d 381, 386 (2d Cir.1997); see also Jin Shui Qiu v. Ashcroft, 329 F.3d at 146 n. 2, mindful that the law must entrust some official with responsibility to hear an applicant’s asylum claim, and the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant. A fact-finder who assesses testimony together with witness demeanor is in the best position to discern, often at a glance, whether a question that may appear poorly worded on a printed page was, in fact, confusing or well understood by those who heard it; whether a witness who hesitated in a response was nevertheless attempting truthfully to recount what he recalled of key events or struggling to remember the lines of a carefully crafted “script”; and whether inconsistent responses are the product of innocent error or intentional falsehood. Reviewing courts have long recognized, as Judge Frank observed, that “‘a witness may convince all who hear him testify that he is disingenuous and untruthful, and yet his testimony, when read, may convey a most favorable impression.’ ” Arnstein v. Porter, 154 F.2d 464, 470 (2d Cir.1946) (quoting Untermeyer v. Freund, 37 F. 342, 343 (C.C.S.D.N.Y.1889)), abrogated on other grounds, as recognized in Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319 (2d Cir.1975). This is because a cold transcript contains only “ ‘the dead body of the evidence, without its spirit.’ ” Id. (quoting Sir John Coleridge in Regina v. Bertrand, L.R. 1 P.C. 520, 535 (1867)). It cannot reveal “ ‘the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or *74 precipitancy, his calmness or consideration.’ ” Id. (quoting Regina v. Bertrand, L.R. 1 P.C. at 535).
It is in this context that our statement in Secaida-Rosales v. INS, that an IJ’s adverse credibility finding “constitutes the beginning not the end of our inquiry,” 331 F.3d 297, 307 (2d Cir.2003) (internal quotation marks omitted), must be understood. Precisely because a reviewing court cannot glean from a hearing record the insights necessary to duplicate the fact-finder’s assessment of credibility, what we “begin” is not a de novo review of credibility, but an “exceedingly narrow” inquiry, Melgar de Torres v. Reno, 191 F.3d 307, 313 (2d Cir.1999) (internal quotation marks omitted), to ensure that the IJ’s conclusions were not reached arbitrarily or capriciously, see Ke Zhen Zhao v. U.S. Dep’t of Justice, 265 F.3d at 86. Toward this end, we look to see if the IJ has provided “specific, cogent” reasons for the adverse credibility finding and whether those reasons bear a “legitimate nexus” to the finding. Secaida-Rosales v. INS, 331 F.3d at 307 (internal quotation marks omitted); see also Ramsameachire v. Ashcroft, 357 F.3d at 178. In short, our review is meant to ensure that credibility findings are based upon neither a misstatement of the facts in the record nor bald speculation or caprice.
Where the IJ’s adverse credibility finding is based on specific examples in the record of “ ‘inconsistent statements’ ” by the asylum applicant about matters material to his claim of persecution, or on “ ‘contradictory evidence’ ” or “ ‘inherently improbable testimony’ ” regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise. Diallo v. INS, 232 F.3d at 288 (quoting In re S-M-J-, 1997 WL 80984, at *729 (B.I.A. Jan. 31, 1997)). In such circumstances, the court may not itself hypothesize excuses for the inconsistencies, nor may it justify the contradictions or explain away the improbabilities. Its limited power of review will not permit it to “reverse the BIA simply because [it] disagree[s] with its evaluation of the facts.” Jin Shui Qiu v. Ashcroft, 329 F.3d at 149 (internal quotation marks omitted).
D. The Record in Zhang’s Case
1. Inconsistent Testimony as a Basis for Finding Zhang Not Credible
Applying these principles to Zhang’s case, we conclude that the IJ’s adverse credibility finding, reiterated by the BIA, is supported by substantial evidence. Certainly, we cannot conclude that no reasonable fact-finder could have failed to credit his persecution claim. See Diallo v. INS, 232 F.3d at 287.
As Zhang himself acknowledges, in assessing credibility, the IJ apparently excused numerous inconsistencies in the record that might be attributable to typographical or translation errors.[8] Nevertheless, he concluded that Zhang’s repeated inconsistent statements at the exclusion hearing regarding the sterilization of his wife “seriously undermine[d][his] truthfulness and credibility” with respect to his persecution claim. IJ Decision at 8.[9] The BIA concurred *75 that “important discrepancies” in Zhang’s account “are indicative of an overall lack of veracity on the part of the applicant.” BIA Decision at l.[10]
The inconsistencies referenced by the BIA are apparent on the record. In response to questions posed on direct examination, Zhang testified that his wife was sterilized approximately one month after the birth of his second child, which would have dated the sterilization sometime in January 1993. At the same time, he stated that the date of sterilization was much later, on June 5,1993.
*76 Q. Aside from the fine [imposed after the birth of your second child], were there any other problems?
A. In addition to the monetary penalty, one month after the kid was — I mean, the baby was born, my wife was taken for sterilization.
Q. When was your wife taken for sterilization?
A. Around June the 5th, ’93.
Q. Didn’t you earlier state that your child was born December 13, 1992?
A. Yeah, the second one is December 13th, ’92.
Q. So your wife was not sterilized then one month afterwards, it was more like six months. Isn’t that correct?
A. No.
Q. When did they — when did you first find out that they wanted to sterilize your wife?
A. June the — June the 5th.
Hearing Tr. at 11-12.
Later on direct examination, in recounting the circumstances under which Chinese officials required his wife’s sterilization, Zhang again testified in a way that suggested that the forcible procedure occurred relatively soon after the December 1992 birth of his second child. He stated that his wife was confronted by a number of Chinese officials “not long after the— giving birth of the baby,” but because “her health was very weak,” she asked for more time, and the officials refused, telling her, “No, there’s no[ ] choice. You have to go today.” Id. at 16.
Zhang does not dispute that his wife’s purported sterilization was critical to his asylum claim and that it was reasonable to expect him to recall the time and circumstances under which he learned of this event. Instead, he argues that his testimonial discrepancies are less indicative of his lack of credibility than of incompetent interpretation and his attorney’s unfamiliarity with the case. This argument, however, is entirely speculative and without support in the record. In any event, Zhang must do more than offer a “plausible” explanation for his inconsistent statements to secure relief; “he must demonstrate that a reasonable fact-finder would be compelled to credit his testimony.” Wu Biao Chen v. INS, 344 F.3d at 275.
In urging such a conclusion, Zhang asserts that the IJ acted too hastily in assuming that the cited inconsistencies evidenced a lack of credibility. The record is to the contrary. After counsel for both sides concluded their examination, the IJ endeavored to clarify the ambiguity created by Zhang’s direct testimony regarding when his wife had purportedly been sterilized relative to when he claimed first to have learned of the event. Nevertheless, Zhang continued to provide inconsistent responses. He initially stated quite clearly that he spoke with his wife in February 1993, which would necessarily have placed the alleged sterilization before that date.
Q. And when you arrived here in January of ’93, did you contact your wife?
A. Yes, I did.
Q. And when did you talk to her?
A. Yeah, around one month after my arrival in the United States.
Q. So sometime in February of ’93?
A. Yes.
Q. Is that when she told you about this incident with the five — five or six government people coming to your wife’s home?
A. Yes.
*77 Q.Now, you stated that you contacted your wife in February of 1993 after you arrived here in the United States.
A. Yes, in February.
Q. February of 1993, and this was about a month after you arrived in the United States?
A. Yes.
Hearing Tr. at 37-39. In response to further questioning, however, Zhang stated that his wife had not yet been sterilized at the time of the February conversation. He reiterated that the procedure occurred months later, on June 5,1993.
Q. And you told me that [the February conversation was] when she told you about the sterilization. She had the birth of the child, and then the government took her for sterilization?
A. Oh, not yet. At that point, not yet.
Q. What happened not yet?
A. Oh, at that point when I call my wife, she was not taken for the sterilization yet.
Q. I see. When did — when did it happen?
A. Yeah, around June the 5th, ’93.
Q. When did you find out?
A. After one month of my arrival in United States, I call back and I learn that the government has notify my family.
Q. So when were you notified that your wife was sterilized? When did you learn your wife was sterilized?
A. After she was sterilized, that’s— when I call back, then I learn.
Id. at 39-40. When Zhang’s counsel then asked his client to approximate the month and year when his wife initially told him of her sterilization, Zhang stated, for the first time, that their conversation took place sometime in July 1993. See id. at 40.
The cited inconsistencies were not the sort of “minor and isolated” discrepancies so plainly immaterial to a persecution claim that no reasonable fact-finder could use them as a basis for an adverse credibility ruling. Diallo v. INS, 232 F.3d at 288. The purported sterilization of his wife was, presumably, an event of major importance to Zhang, not only to his persecution claim but also to his marriage. A fact-finder might reasonably expect him to have had a clear recollection of when and how he learned such distressing information. Thus, the fact that Zhang repeatedly testified that his wife told him of her sterilization in February 1993, while he otherwise dated the procedure months later, in June 1993, rendered his account of key events incoherent, raising legitimate concerns about his veracity. Moreover, without having seen Zhang testify, we cannot conclude that such concerns were necessarily dispelled by Zhang’s belated claim that his wife first told him of her sterilization in July 1993.
As already noted, it is not our task to see if Zhang’s inconsistent statements can somehow be reconciled. Neither do we weigh the inconsistencies for ourselves to see if we would reach the same credibility conclusions as the IJ, who actually observed Zhang testify, or the BIA. See Jin Shui Qiu v. Ashcroft, 329 F.3d at 149. We consider only whether, on the evidence adduced, a reasonable adjudicator would be compelled to conclude, contrary to the IJ and BIA, that Zhang provided a credible account of persecution. See Wu Biao Chen v. INS, 344 F.3d at 275. We hold that the record does not compel such a conclusion. The cited inconsistencies qualify as “specific, cogent” reasons, bearing a “legitimate nexus” to the IJ/BIA findings that Zhang was not credible in recounting the alleged forcible sterilization of his spouse. Secaida-Rosales v. INS, 331 F.3d *78 at 307 (internal quotation marks omitted); see also Ramsameachire v. Ashcroft, 357 F.3d at 178. Further, because his spouse’s sterilization was integral to Zhang’s overall persecution claim, see Ramsameachire v. Ashcroft, 357 F.3d at 182, the adverse credibility findings on this point provided specific, cogent reasons bearing a legitimate nexus to the IJ/BIA’s findings that Zhang’s credibility was generally suspect.
In sum, we conclude that the IJ and BIA findings that Zhang was not credible are substantially supported by the record.
2. Lack of Corroborative Evidence
Zhang submits that the IJ and BIA erroneously denied him asylum based on his failure to produce certain corroborative documents about his wife and family without adequately assessing whether the materials were reasonably available to him. See Jin Shui Qiu v. Ashcroft, 329 F.3d at 153 (observing that to deny asylum “for want of sufficient corroboration, the adjudicator must (a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner”); see also Diallo v. INS, 232 F.3d at 285 (holding that an asylum applicant may be required to produce “evidence corroborating his story, or an explanation for its absence, ... where it would reasonably be expected”).
Although the IJ made no specific finding as to availability, the record hardly suggests that this issue presented any real concerns. Zhang testified that in the weeks before his July 1, 1998 hearing, he had requested and received from his wife in China the birth, marriage, household registration, sterilization, and fine certificates that were offered in evidence to support his persecution claim. Thus, Zhang’s failure to produce similar documents, which the IJ considered more probative, could reasonably be deemed more a product of Zhang’s oversight or neglect than of the documents’ unavailability. Such a conclusion would certainly be warranted with respect to the most significant missing document identified by the IJ: an affidavit or statement from Zhang’s wife detailing her forcible sterilization. In response to an IJ inquiry about why he had not asked his wife to send such a document, Zhang did not assert unavailability. Rather, he replied, “Oh, the time was rather urgent, and I forgot to mention that.” Hearing Tr. at 39. In claiming that he was pressed for time, Zhang ignored the fact that he had waited five years to seek reopening of his asylum application.
Even if Zhang’s ability to secure the identified corroborative documents were in doubt, however, he would not be entitled to the relief sought in this petition. The requirement for corroborative documents’ “identification” and “availability” articulated in Jin Shui Qiu v. Ashcroft (as derived from Diallo v. INS) pertains when the IJ or BIA cites inadequate corroboration as a basis for denying asylum to an applicant who is otherwise credible. See Jin Shui Qiu v. Ashcroft, 329 F.3d at 153 (noting that Diallo recognized IJ authority to deny asylum “in some cases where the applicant has failed to provide certain corroborative documents, even though the applicant testified credibly to facts that, if true, would qualify her for refugee status”). That is not this case. If Zhang’s failure to produce the identified corroboration were excused, what would remain would be (1) the IJ’s finding that Zhang’s “inconsistent testimony ... seriously undermines the applicant’s truthfulness and credibility before the Court,” IJ Decision at 7-8, and (2) the BIA’s finding that “important discrepancies” in the evidence “are indicative of an overall lack of veracity on the part of the applicant,” BIA Deei *79 sion at 1. Such adverse credibility findings, by themselves, constitute substantial evidence to support the conclusion that Zhang failed to carry his burden of proof on his persecution claim.[11]
III. Conclusion
To summarize, we conclude (1) that the adverse credibility findings of the IJ, thereafter concurred in by the BIA, were supported by substantial evidence of inconsistent statements by Zhang on matters material to his asylum claim, and (2) that such adverse credibility findings themselves constitute sufficient evidence that Zhang failed to carry his burden of proof, without regard to whether the identified corroboration was or was not available to him. Accordingly, Zhang’s petition for review of the BIA order dismissing his appeal is hereby DENIED.

. Because Zhang’s exclusion proceedings commenced before April 1, 1997, and a final order was issued after October 30, 1996, this court has jurisdiction to consider his petition for review under former § 106(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1105a(a) (repealed 1996), as modified by the relevant transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA”), Pub.L. No. 104-208, div. C, tit. Ill, § 309(c)(1), (4)(A), 110 Stat. 3009, 3009-625 to -626 (1996) (codified at 8 U.S.C. § 1101 note). See Diallo v. INS, 232 F.3d 279, 282 n. 1 (2d Cir.2000).
We note that IIRIRA changed the vocabulary of immigration proceedings, recharacter-izing actions that had been referred to as "deportation” and “exclusion” as "removal.” See Evangelista v. Ashcroft, 359 F.3d 145, 147 n. 1 (2d Cir.2004). Thus, the form of relief that had been called "withholding of deportation or return,” see 8 U.S.C. § 1253(h) (Supp. V 1993), is now called "withholding of removal,” see 8 U.S.C. § 1231(b)(3). For ease of reference in this opinion, however, we employ the pre-IIRIRA vocabulary in effect at the time of Zhang’s application.

. In his initial entry interview, conducted in Mandarin, Zhang purportedly told an Immigration and Naturalization Service inspector that he was a carpenter, married, with one child, a four-year-old daughter. He had come to the United States in search of work, having left his home in the Fujian Province in October 1992, and traveled first to Hong Kong and then to Brazil where a smuggler arranged for his trip to New York. Zhang stated that he did not like China's one-child policy, but he reported no specific problem with the Chinese government. His principal concern with returning to China was that he would not be able to make a living there because of the low wage.
Although these statements were inconsistent with others that Zhang would subsequently make to support an application for asylum and withholding of deportation, his entry interview was not received in evidence at the exclusion hearing that addressed that application, apparently because of questions about adequate translation and timely disclosure. Because our review is limited to the record before the IJ and BIA, we too do not consider the entry statements in ruling on Zhang's petition.

. It is not clear from the amended application whether, after his wife's alleged sterilization, Zhang still maintained a subjective fear for his own sterilization if he were to return to China. See Ramsameachire v. Ashcroft, 357 F.3d 169, 178 (2d Cir.2004) (holding that feared future persecution must be both subjectively and objectively reasonable). We need not resolve the matter, however, because, as discussed in Part II.B, infra, the BIA permits a husband whose wife has been the victim of forcible sterilization to seek asylum based on his spouse’s persecution.

. Section 1101(a)(42) states in relevant part: For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.
Id.

. We note that pursuant to INA § 207(a)(5), 8 U.S.C. § 1157(a)(5), no more than 1,000 refugees per year may be granted asylum on the ground of persecution for resistance to coercive population control measures, whether direct or spousal. Qualified asylum applicants in excess of 1,000 are not removed from the United States; rather, such persons remain in the country pursuant to a conditional grant of asylum, which is finalized when a spot becomes available in a future year. See U.S. Citizenship and -Immigration Services, Resistance to Coercive Population Control (CPC) Programs, at http://uscis.gov/graphics/ser-vices/asylum/cpc.htm. As of September 30, 2003, over 7,000 asylum applicants remained in conditional grant status. See News Release, Executive Office for Immigration Review, U.S. Dep't of Justice, EOIR Notifies Persons Eligible for Full Asylum Benefits for Fiscal Year 2003 Based on Coercive Population Control Policies, available at http://www. usdoj.gov/eoir/press/03/CPCAsylumRelease 0903.pdf. Presumably, this means that some conditional grants pending in 2003 will not be finalized until 2010, see id., a situation that may warrant congressional attention.

. Zhang testified that he had to pay a smuggler "20,000 or 30,000” to arrange for his travel to the United States, but the record is not clear as to whether he was referring to U.S. dollars or some other currency. Hearing Tr. at 36.

. We note that IIRIRA has now codified this standard of review, providing that “the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude the contrary.” IIRIRA § 306(a), 110 Stat. at 3009-608 (codified at 8 U.S.C. § 1252(b)(4)(B)).

. For example, in his asylum application, Zhang indicated that his first child was bom in 1988, whereas he testified that the birth occurred in 1989. Similarly, Zhang stated in his asylum application that his second child is named "Zhang Yong,” but his family’s household registry lists the child's name as "Zhang Tian Ming.”

. Although our dissenting colleague suggests that this is not an "explicit[]” statement by the IJ that he was rejecting Zhang's testimony *75 on credibility grounds, infra at [Dissent, page 82 n. 2], we do not think the language can he construed otherwise.

. Because our dissenting colleague disagrees with our conclusion that the quoted language evidences an adverse credibility finding by the BIA, we cite the relevant passage from the BIA decision in its entirety:
The Immigration Judge cites several important discrepancies surrounding the facts that form the basis of the applicant's claim. While some of these may have an explanation, we find that these problems, while not conclusive in themselves, are indicative of an overall lack of veracity on the part of the applicant. An asylum applicant bears the evidentiary burden of proof and persuasion, and where there are significant, meaningful evidentiary gaps, applications will ordinarily have to be denied for failure of proof. While the Immigration Judge emphasizes the lack of supporting documents provided by the applicant, we note that an alien's own testimony may in some cases be the only evidence available, and it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for her alleged fear. Here, we agree with the Immigration Judge that the applicant has not presented consistent, detailed or credible testimony. We simply cannot find the testimony, of limited credibility and lacking in detail, combined with the few documents, provide sufficient evidence to meet the overall burden of proof.
BIA Decision at 1-2 (internal citations omitted) (emphasis added).
This passage leaves us with no doubt that the BIA expressly agreed with the IJ’s adverse credibility finding: "we agree with the Immigration Judge that the applicant has not presented consistent, detailed, or credible testimony.” Id. at 2 (emphasis added). The fact that the BIA, in the next sentence, characterized Zhang’s testimony as of "limited credibility” does not undermine this conclusion. Id. Few witnesses lie in response to every question asked. The BIA, however, expressly ruled that the record of inconsistencies in Zhang's case demonstrated "an overall lack of veracity on the part of the applicant.” Id. at 1 (emphasis added).
The dissent suggests that this conclusion was somehow qualified by the BIA’s acknowledgment that "some” of Zhang's inconsistent statements “may have an explanation”, and its recognition that the inconsistencies were not themselves "conclusive.” Id. We disagree. This sentence is structured not to qualify the credibility finding with the two observations but to clarify that the adverse credibility finding is made despite the observations: "While some of these [discrepancies] may have an explanation, we find that these problems, while not conclusive in themselves, are indicative of an overall lack of veracity on the part of the applicant.” Id.
In any event, we read the BIA's observations somewhat differently from our dissenting colleague. When viewed in light of the hearing record, the first statement appears to acknowledge simply that "some” inconsistencies noted by the IJ were excused by him as possibly attributable to translation or typographical errors. But the word "some” suggests that not all inconsistencies could be so excused; notably, not Zhang's inconsistent accounts of when his wife was sterilized and when he learned of this event. As for the BIA's statement that the inconsistencies in Zhang's testimony were not "conclusive,” we understand this to mean that resolution of the factual discrepancies would not conclusively determine the issue of persecution. Regardless, the inconsistencies did permit a conclusion that Zhang demonstrated an "overall lack of veracity.” Id.
In sum, we are satisfied that the BIA, like the IJ, specifically found that inconsistencies in the hearing record indicated that Zhang had failed to provide credible testimony to support his asylum claim.

. We do not agree with our dissenting colleague that the BIA improperly considered the lack of detail in Zhang's testimony to conclude that he had not met his burden of proof. In Jin Shui Qiu v. Ashcroft, 329 F.3d at 151-52, we cautioned against faulting an asylum applicant who otherwise testified credibly for failing to provide sufficient details in support of his claim, particularly if no efforts were made to elicit such detail through questions to the applicant. But Jin Shui Qiu's admonitions do not pertain to a case such as this where the applicant's testimony was independently found to lack veracity.
We recognize, of course, that to the extent Zhang was testifying about his wife's alleged sterilization, an event about which he had no personal knowledge, he could not be expected to provide the same level of detailed testimony as an applicant who was with his spouse in China at the time of the forcible procedure. In Zhang’s case, however, it was the very details that he should have known, i.e., when and how he learned that his wife was sterilized, about which he could not provide either consistent or detailed testimony. Accordingly, the record supports the conclusion that he failed to carry his burden of proof.