BAO Zhu Zhu, Ye Zheng, Shi Kun Zheng, also known as Xi Kwan Zheng, Petitioners,

v.

Alberto GONZALES,* Respondent.

Docket No. 03–40452–ag.

United States Court of Appeals, Second Circuit.

Argued: May 25, 2005.

Decided: Aug. 22, 2006.

---

\* Pursuant to Federal Rule of Appellate Procedure 43(c), we have substituted Attorney General Alberto Gonzales for former Attorney General John Ashcroft as the respondent in this case.

Craig T. Donovan, Law Offices of Nolan Cheng, New York, NY, for Petitioners.

Stephen B. Clark, Assistant United States Attorney, for Ronald J. Tenpas, United States Attorney for the Southern District of Illinois, Fairview, IL, for Respondent.

Before CALABRESI, B.D. PARKER, Circuit Judges, MUKASEY, District Judge.**

B.D. PARKER, Jr., Circuit Judge.

Petitioners Bao Zhu Zhu ("Bao"), and her two sons, Ye Zheng and Shi Kun Zheng, petition for review of an order of the Board of Immigration Appeals summarily affirming an Immigration Judge's denial of their asylum application. Based on an adverse credibility finding, the IJ rejected the petitioners' application for asylum and withholding of removal under the Immigration and Nationality Act of 1952 as well as their request for relief under the United Nations Convention Against Torture ("CAT").[1] *See* 8 U.S.C. § 1158(a), § 1231(b)(3).

We find that the IJ erred by arbitrarily preferring assertions in Bao's husband's application for asylum to those in hers and then arbitrarily using the husband's assertions as the basis for deeming her not credible. Consequently, we vacate the BIA's decision and remand it.

## BACKGROUND

Bao and her children are Chinese nationals from the Fujian province. Bao was married in a traditional village wedding in 1980 and registered her marriage in 1990. She and her husband, Yu Kai Zheng ("Zheng"), had two sons: one in 1982 and another two years later. Bao's children's claims for asylum have been joined and are derivative of Bao's petition.

In 1998, Bao's older son arrived in the United States from China. A year later Bao arrived with her younger son. The Immigration and Naturalization Service paroled Bao and her younger son into the United States. In August 2000, she, on behalf of herself and her sons, filed an I–589 asylum application contending that she had been subjected to China's coercive family planning policies.

In December 2001, Bao appeared before Immigration Judge Gabriel C. Videla. The IJ waived the appearances of Bao's sons and her attorney informed them that their appearances were unnecessary. Bao

---

** The Honorable Michael B. Mukasey, District Judge, United States District Court for the Southern District of New York, sitting by designation.

1. Adopted Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85; 8 C.F.R. § 208.16. Because petitioners do not appeal the IJ's denial of CAT relief, that claim has been waived. *See Yueqing Zhang v. Gonzales,* 426 F.3d 540, 542 n. 1, 545 n. 7 (2d Cir. 2005).

submitted, among other documentation, birth certificates for herself and her children, a marriage certificate, a household registration form, a sterilization certificate, an affidavit from her husband, and a family photograph.

Through her documentation and testimony, Bao presented the following facts. In 1984, shortly after the birth of her second child, she was notified by a local birth control official to report for the insertion of an intrauterine device within two days or be heavily fined. Bao complied with the order and after the IUD was inserted, she was required to report for IUD inspections three or four times a year. By the spring of 1990, the IUD was causing her significant discomfort and she had it removed by a private physician. At that point, rather than face the required inspections, Bao and her sons went into hiding at her mother's house and consequently she missed IUD inspections scheduled for July and October 1990.

As a result, family planning officials searched for and, in November 1990, found Zheng at home and arrested him because Bao had not appeared for her scheduled inspections. He was briefly detained before his mother secured his release and promised the officials that Bao would appear and submit to sterilization. At that point, Zheng fled China for the United States.

Bao testified that she refused to appear voluntarily for sterilization. In January 1991, she was seized at her mother's house by birth control officials who transported her to a family planning facility. There, Bao was taken to an operating area where her legs and hands were bound and she was forcibly sterilized. She testified that following the procedure she experienced considerable pain in the area where the procedure had occurred as it became infected and required re-suturing.

Bao asserted that, in addition to forced sterilization, she was required to pay an 100 RMB fine when she registered her second son. Also, due to a change in local policies, in May 1999 she had been fined an additional 30,000 RMB (about $3,750), because four years had not elapsed between the birth of her first and second sons. She testified that when she refused to pay the second fine, her younger son was not permitted to attend school and her windows, doors, furniture and other belongings were destroyed by the government. At this juncture, having been sterilized, with a large pending fine, her belongings destroyed, and her younger son unable to attend school, Bao testified that she decided to leave China.

Zheng, who had left China in 1990, entered the United States from Mexico in 1993, and submitted an individual asylum application the same year. He sought asylum based on the facts that he had two sons, he strongly opposed China's family planning policies, and he had fled the country when he was notified to appear for sterilization. Zheng also stated that his wife was forcibly sterilized in 1985 and sought asylum on that ground as well.

His application was denied. In July 1997, Zheng was ordered deported but, in violation of the order, remained in the United States. Although Zheng submitted an affidavit to the IJ in this case, he did not appear, allegedly fearing arrest as a consequence of his illegal status.

The IJ did not believe Bao and denied her application. The IJ believed she had been sterilized, but questioned whether it had been involuntary. While the IJ provided some additional bases for his adverse credibility determination, he mainly focused on discrepancies between Zheng's version of events in his independent asylum application and interview and Bao's

own version presented in her testimony before the IJ.

For example, the IJ focused on such things as the fact that Bao could not explain why her husband, in his 1996 asylum interview, stated that he was present for her sterilization, that he had been fined 2,000 RMB, and that Bao had been sterilized a year after the birth of their younger son. In addition, the IJ focused on a number of discrepancies between their statements regarding when the sterilization occurred (he said 1985, she said 1991) and the circumstances of the fines and arrests. The IJ also noted inconsistencies between the husband's affidavit, which petitioner proffered, and his previous asylum application. The IJ registered suspicions regarding the authenticity of her documentation and her multiple explanations for why her household registration booklet was issued in August 1990, a time when Bao was allegedly in hiding. Finally, the IJ noted that he found Bao's description of her forced sterilization implausible. The IJ concluded that the "discrepancies added together lead the Court to believe that her testimony is not credible, therefore, the Court cannot find that the respondent has established credibly that she had an involuntary sterilization procedure in China."

The BIA summarily affirmed the IJ's decision "except insofar as the Immigration Judge's finding was tied to his views regarding, and the plausibility of, the respondent's description of the sterilization procedures."

This appeal followed.

## DISCUSSION

When, as here, "the BIA affirms the IJ's decision in all respects but one, we review the IJ's decision as modified by the BIA decision, i.e., 'minus the single argument for denying relief that was rejected by the BIA.'" *Ming Xia Chen v. Bd.of Immigration Appeals,* 435 F.3d 141, 144 (2d Cir.2006) (quoting *Xue Hong Yang v. United States Dep't of Justice,* 426 F.3d 520, 522 (2d Cir.2005)).

We review factual findings of the IJ under the substantial evidence standard. *See Secaida–Rosales v. INS,* 331 F.3d 297, 306–07 (2d Cir.2003). We will uphold the determination if it "is supported by 'reasonable, substantial, and probative' evidence in the record when considered as a whole." *Id.* at 307 (quoting *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000)). "[W]here an asylum seeker has challenged an adverse credibility decision, we typically afford 'particular deference' to the IJ's conclusions." *Ming Shi Xue,* 439 F.3d at 118 (quoting *Zhou Yun Zhang v. INS,* 386 F.3d 66, 74 (2d Cir. 2004)). "Our review of an IJ's credibility assessment is an 'exceedingly narrow inquiry.'" *Id.*

However, "the fact that the BIA has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review." *Ramsameachire v. Ashcroft,* 357 F.3d 169, 177–78 (2d Cir.2004). In reviewing adverse credibility findings, we consider whether "the IJ has provided specific, cogent reasons for the adverse credibility finding and whether those reasons bear a legitimate nexus to the finding. In short, our review is meant to ensure that credibility findings are based upon neither a misstatement of the facts in the record nor bald speculation or caprice." *Zhou Yun Zhang,* 386 F.3d at 74 (internal citations and quotation marks omitted); *see also Secaida–Rosales,* 331 F.3d at 307.

An asylum applicant must, as a threshold matter, establish that she is a "refugee" within the meaning of INA § 101(a)(42). An applicant may establish

eligibility for asylum by demonstrating that she has been subjected to past persecution based on one of the five enumerated grounds and as a result is unwilling or unable to return to her home country. After a demonstration of past persecution, a presumption arises that the alien has a well-founded fear of future persecution. *See Ramsameachire,* 357 F.3d at 178. In 1996, Congress amended the statutory definition of "refugee" to provide that forced abortion or forced sterilization, or persecution for failure to undergo such a procedure or for other resistance to a coercive population control program, constitutes persecution "on account of political opinion." *See* 8 U.S.C. § 1101(a)(42). In addition, the BIA has held that an alien whose spouse has been forced to undergo abortion or sterilization has established his own persecution. *See Ke Zhen Zhao v. United States Dep't of Justice,* 265 F.3d 83, 92 (2d Cir.2001); *In re C–Y–Z–,* 21 I. & N. Dec. 915, 918–19 (BIA 1997).

Here, the IJ believed that Bao had been sterilized, but doubted whether the procedure had been involuntary. Finding Bao otherwise not credible, the IJ determined that she had failed to establish that she had been subjected to involuntary sterilization and thus had not proved herself a victim of past persecution.

■ The BIA's adverse credibility finding was largely based on inconsistencies between Bao's testimony and her husband's independent asylum application submitted in 1993 and his 1996 asylum interview. The majority of the IJ's reasons for finding Bao not credible, which were affirmed by the BIA, are tied to discrepancies between their respective versions. Because we conclude, for the reasons stated below, that the IJ's use of Zheng's application and asylum interview in this case was arbitrary, we vacate and remand.

To reach his adverse credibility determination, the IJ predominantly relied on his findings of multiple inconsistencies between Bao's testimony and Zheng's asylum application and asylum interview. They were: (1) the fact that Zheng stated Bao had been sterilized in 1985 shortly after giving birth to her second son, while Zheng was still in China; (2) Zheng's statement that they had been fined 2,000 RMB; and (3) the omission of any reference to Zheng's arrest in his asylum application. In reaching his conclusion, the IJ emphasized that the versions were incompatible and that Zheng's story was more reliable.

■ We are unable to follow the IJ's reasoning which, to us, is speculative on the one hand, and arbitrary on the other. The IJ found the discrepancies "so significant that they strongly suggest that someone here is not telling the truth, that something was totally fabricated. There's absolutely no way to reconcil[e] one verison with the other." The IJ gave "absolutely no weight whatsoever" to the 2001 affidavit that Zheng submitted in this case on the theory that he was not available for cross examination. But the IJ gave "great weight to the assessment memo from the asylum office" concluding that Zheng, in that interview, would have had no reason to fabricate a claim based on China's coercive birth control policies. Because this explanation similarly could not be cross examined, we are confused as to why the IJ would not feel compelled to apply the same reasoning to both statements. If the opportunity for cross examination was determinative—as it was for the IJ here—we cannot divine from the record why the IJ would conclude that, on the one hand, Zheng had "no reason to lie or make up a claim" and that his asylum application was therefore reliable but that, on the other hand, Bao was fabricating her version. While we rarely disturb credibility find-

ings, we do when, as here, they are arbitrary. *See Ramsameachire*, 357 F.3d at 178.

The IJ implied that because Zheng's application preceded legislation and the BIA's decision in *In re C–Y–Z–*, 21 I. & N. Dec. 915 (B.I.A.1997), which established that forcible application of the family planning policy constituted persecution on account of political opinion for both the victim and the victim's spouse, Zheng would have no reason to fabricate the facts asserted in his application. *See* 8 U.S.C. § 1101(a)(42). However, although Congress had not amended the statute at the time of his asylum interview, Zheng was still asserting his opposition to China's family planning policies and offering the experiences of himself and his wife as the basis for an asylum application. Since the expansion of the definition to include spouses of forced sterilization victims, this Court has stated:

> This expansion of the concept of "refugee," coupled with the law's recognition that some asylum claims cannot be corroborated, presents significant challenges in distinguishing valid from invalid claims of persecution based on China's coercive population control policies. After all, virtually any young, undocumented Chinese male seeking to enter the United States can assert that he is married and seeking asylum based on his spouse's forcible abortion or sterilization.... Such claims can present an almost infinite variety of circumstances, from men whose claims of marriage and persecution are entirely fabricated; to men whose wives did have documented abortions or sterilizations, but not involuntarily; to men who use their wives' involuntary abortions or sterilizations as an excuse to abandon family responsibilities.

*Zhou Yun Zhang*, 386 F.3d at 72. This range of possibilities applies to Zheng's application, even though it was submitted prior to the statutory expansion. We are therefore at a loss to determine why the IJ believed Zheng had no motive to fabricate his asylum application or why the application afforded a rational reason to prefer his version to hers.

We are particularly troubled since Bao clearly and consistently testified that her forced sterilization occurred after her husband left China in 1990 and provided several other examples of political persecution that she allegedly experienced after his departure. She did not attempt to explain why her husband's version of their experiences differed. Instead, Bao testified that she did not know why Zheng had testified as he did and stood by her account of her experiences.

But the IJ then proceeded to accept Zheng's account as credible and to reject hers as fabricated. Why the IJ did this, we can not say. Since Zheng did not testify, the IJ was unable to judge his credibility directly. Since Zheng's prior statements were not subject to cross examination—an important defect according to the IJ—we are unable to determine why he credited them over Bao's testimony. It is impossible for us to know from this vantage point why Zheng made the statements and omissions that he did. Perhaps he thought exaggerations and untruths regarding Bao's sterilization and a 2,000 RMB fine would improve his chances to gain asylum. The point is that the IJ never adequately confronted the fact that in his 1993 application, Zheng had self-evident motives to invent or enhance events. The IJ simply decided without any further elaboration that Zheng was telling the truth in his original asylum interview and application and that therefore Bao was not. This is arbi-

trary decision making.[2] *See Zhou Yun Zhang*, 386 F.3d at 74.

■ In addition to his emphasis on the discrepancies between the spouses' versions of the events, the IJ cited additional inconsistencies to support his adverse credibility determination. However, the IJ's arbitrary reliance on Zheng's asylum interview and application constituted the bulk of the IJ's reasoning.[3] The additional inconsistencies noted by the IJ focus on small details, and, in certain instances derive from mischaracterizations of the record. Accordingly, although we take no position on whether these reasons may support a valid credibility determination on remand, we do not believe they could on their own support the adverse credibility finding in the circumstances presented here. *See Secaida–Rosales*, 331 F.3d at 307; *see also Zhou Yun Zhang*, 386 F.3d at 74.

For example, the IJ stated that Bao could not explain why the household registration booklet submitted as evidence was issued in August 1990, when she was allegedly hiding. The IJ mischaracterized Bao's testimony on this point. Bao testified that her mother-in-law (not her mother as the IJ states) obtained the document and that her mother-in-law was not listed as part of her household but as part of her brother-in-law's household because the government officials separate households, such as Bao's, that have over ten members. She testified that her mother-in-law had previously been part of her household.

In addition, the IJ found that Bao's failure to disclose her sister in the United States was "just one more inconsistency or discrepancy" to support his adverse credibility finding. She had testified that she had two sister-in-laws, a brother-in-law, and an uncle in the United States and later explained that she had not mentioned her sister because she thought the question was only requesting a list of her husband's relatives. For the IJ, the omission of her sister in answering the IJ's question regarding family members in the United States, like the unclear explanation for the date on the household registry, were not significant in comparison to the discrepancies with the husband's asylum application and interview.

■ Because the IJ[4] did not attach to the other discrepancies he noted anything approaching the significance he accorded the differences in the couple's applications, we cannot state with confidence that a

---

**2.** We emphasize that our decision rests on the arbitrary nature of the IJ's reasoning, rather than on any *per se* prohibition against an IJ's reliance on discrepancies between two asylum applications on related statements. We need not, and hence do not, decide here under what circumstances an IJ may rely validly on such discrepancies in concluding that an applicant is not credible or has failed to meet her burden of proof.

**3.** In addition, the BIA rejected the IJ's finding that Bao's description of the sterilization procedure was implausible, and therefore we do not review it as part of the BIA's or IJ's basis for denying asylum here.

**4.** The IJ also noted that Bao "claimed to have some witnesses readily available to testify to corroborate her claim but the witnesses did not come forward." However the "IJ [ ] must assess the applicant's reasons for not furnishing the corroboration at issue," something that did not happen here. *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 401 (2d Cir. 2005). Bao's counsel explained that she had told Bao's sons that their appearances were not needed and Bao's husband would not appear because he feared deportation. In light of the centrality of Zheng's asylum application to the IJ's decision in this case, if the BIA decides to remand to the IJ for further factfinding, the IJ may wish to permit Zheng to offer telephone testimony. The IJ may also wish to indicate that testimony by Bao's sons, both of whom are petitioners in this case, could be useful.

remand would be futile under the circumstances presented. *See e.g., Lin Li Hua v. Dep't of Justice*, 453 F.3d 99, 111 (2d Cir. 2006) ("The more central an errant finding was to the IJ's adverse credibility determination ... the less confident we can be that remand would futile.").[5]

## CONCLUSION

Accordingly, the petition for review is GRANTED, the decision of the BIA is VACATED and REMANDED.

---

**5.** The IJ's denial of Bao's application for withholding of removal was based on the determination that Bao failed to establish eligibility for asylum. We therefore vacate and remand for reconsideration of the denial of Bao's withholding of removal claim as well.