KYAW ZWAR TUN, Petitioner,

v.

UNITED STATES IMMIGRATION
AND NATURALIZATION
SERVICE, Respondent.

Docket No. 02–4859.

United States Court of Appeals,
Second Circuit.

Argued: May 23, 2005.

Decided: April 21, 2006.

Theodore N. Cox, New York, NY, for Petitioner.

Lisa E. Perkins, Assistant United States Attorney (Kevin J. O'Connor, United States Attorney for the District of Connecticut, and William J. Nardini, Assistant United States Attorney, on the brief), for Respondent.

OAKES, KEARSE, and POOLER, Circuit Judges.

POOLER, Circuit Judge:

Petitioner Kyaw Zwar Tun petitions for review of the Board of Immigration Appeals (BIA)'s October 31, 2002, order summarily affirming the Immigration Judge (IJ)'s decision, rendered orally on March 21, 2000, rejecting his claims for asylum and withholding of removal and relief under the Convention Against Torture, and ordering him removed to Burma.[1]

## BACKGROUND

### Petitioner's Entry and Claim

Petitioner, in his late thirties, is a male native and citizen of Burma. After entering the United States on a limited seaman's visa in Houston, Texas, on May 5, 1991, he remained in the country illegally after his ship left port. Petitioner first applied for political asylum in September 1993. An asylum officer denied his application and placed him in removal proceed-

---

**1.** While the Burmese military government declared in 1989 that the country's name would henceforth be "Myanmar," and while the country is often referred to as "Myanmar" in diplomatic discourse, petitioner, and most of the documentary evidence in the record, much of which comes from the Burmese pro-democracy movement, consistently refer to the country by the name which it held from 1948 until 1989. We therefore refer to the country throughout this opinion as "Burma."

ings. He conceded removability before the IJ, but asserted claims for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, December 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85 (hereinafter, "Convention Against Torture"), *implemented by* Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, Div. G., Tit. XXII, § 2242, 112 Stat. 2681–822 (codified at 8 U.S.C. § 1231 note). A hearing on the merits of those claims was held before the IJ on March 21, 2000, at the conclusion of which the IJ denied Tun's claims and ordered him removed.

### Evidence at the Hearing

At the March 21, 2000, hearing, Tun relied on his own testimony, the testimony of his cousin, Ye Lin, the expert testimony of Dr. Aye Kyaw, and various items of documentary evidence to establish that due to his pro-democracy political activities both before leaving Burma and as a member of the Burmese exile community in the United States, the authoritarian government in Burma had persecuted him while he was there and is likely to do so in the event that he returns.

According to his testimony, in 1998, as a first-year history major at Dangi College, Tun became a pro-democracy activist. The precipitating event for his entry onto the political stage was the March 13, 1988, murder of a student-activist by the military at another university. Tun organized a group of friends to attend a peaceful demonstration on his campus, protesting this murder; it continued for two days. On the second day, as the demonstration grew, the military attacked the demonstrators, beating and arresting some protestors in order to disperse the crowd. Thereafter, Tun distributed pro-democracy pamphlets, posted anti-government posters, and attended several protest events beginning August 8, a day of nationwide protest. These events included a march and numerous demonstrations held throughout the city of Dangi. During the month of August, Tun participated in the organization of, and was a founding member of, the Dangi College Student Union, an organization that aimed to organize further pro-democracy and anti-government demonstrations and activities. In early September, Tun attended a demonstration organized by the Student Union outside a military base. Demonstrations continued until September 18, 1988, when the military staged a coup d'etat, seized power, and dispersed the student demonstrators throughout the country.

On October 10, 1988, Tun was arrested by five soldiers who came to his house and took him to a police station. He was held for two weeks, during which time he was interrogated repeatedly regarding the Student Union, subjected to beatings, forced to stay awake, and denied food. Tun was released after his parents promised under compulsion that he would not participate in further demonstrations and that if he did they would be responsible. After his release, he was required to report daily to the police. He stated that he had no medical records to corroborate the beatings because, afraid to go to the hospital, he received only home treatment for his injuries.

Early in 1989, after hearing that demonstrators who had previously been released were being rearrested, Tun went into hiding in an aunt's home in Rangoon. While in hiding, Tun was married, in accord with prior arrangements made by his parents. He registered his marriage on April 27, 1989. His wife later informed him that military intelligence officers had come to his house to arrest him. Tun stated that

during the two years that he was at his aunt's house, he did nothing other than attempt to get travel documents to leave Burma. He did not go outside; he was not politically active; he did not work; and his parents supported him.

Tun decided to flee the country and, fearing that this would be difficult as a known political activist, secured the services of a broker who could procure both false identification and false permission to leave the country. For a payment of 20,-000 kyats, the broker obtained a false passport for Tun and arranged for him to attend a two-week training course in marine science at the beginning of 1990, after which he received a seaman's certificate that allowed him to leave Burma. Tun stated that anybody with a passport and employment letter could attend the training course, but he also said that the broker helped him gain admission. He stated that his uncle in England helped Tun obtain an employment letter from a friend in Singapore. The training covered operation of a fire extinguisher and lifeboat.

Tun left Burma on November 16, 1990, on a flight to Singapore, where he boarded a ship to work as a seaman. As a seaman, he passed through numerous countries, including the United States, as well as Indonesia, Taiwan, Malaysia, Belgium, and Mexico, but each time he left with the ship. He stated that he did not flee the ship the first time it passed through the United States because when he told a Burmese crew member friend that he wanted to go to the United States to continue his activism, his friend told him not to leave yet. Later, while in Mexico, he learned that the crew would soon be returning to Burma. Thus, with the aid of his friend, he obtained his passport and seaman's book so that he would be able to leave. On May 5, 1991, the ship arrived in Houston, Texas. When the ship left port, Tun remained illegally in the United States. He traveled by bus to New York, where he moved in with an aunt.

Tun testified that his mother, father, brother, and two sisters now live in New York City, having arrived during the mid–1990s. New York was the location of his hearing, yet none of these close relatives testified. Moreover, Tun presented no statements from any of these easily accessible relatives corroborating his political activity or arrest in Burma, despite the fact that, according to his testimony, his parents had personal knowledge of his arrest through having secured his release from jail. However, Tun did submit a letter from his wife, dated December 12, 1998; it does not mention his political activity or arrest, although it does state that military intelligence agents had come looking for him and they had indicated their awareness of his political activities in the United States.

Tun explained the absence of a more informative statement from his wife by stating that his wife would get in trouble if she wrote about his political activity or arrest. He explained the lack of information from his brother by stating that his brother was living in a different city during the period of the student demonstrations in Dangi. He provided no explanation for his parents' failure to testify or submit a written statement.

Tun did not apply for political asylum until September 1993. He explained this delay by stating that when he first arrived, "I did not know that something like political asylum was possible to be done. After being here for awhile from others I've come to find out that I can apply for asylum."

A number of discrepancies exist between the information contained in Tun's original application and his hearing testimony. First, his original application states that he

and his brother were members of the National League for Democracy (NLD) headed by Nobel laureate Aung San Suu Kyi. At his hearing, however, Tun testified that he was actually only a supporter, and not a member, of the NLD. The original application also stated that Tun's brother was arrested with him in 1988, but he later testified that only he was arrested. Tun attributed these discrepancies to the fact that a non-lawyer helped him draft his initial application and that he did not read it carefully before submitting it. In 1999, Tun submitted a second application for asylum together with an accompanying affidavit; these were in all material respects consistent with his testimony.

Tun first became politically active in the United States in 1997, when he joined the Burma Action Committee (BAC). He explained the delay between his 1991 arrival and his first political activities in this country by stating that there were not "that many organizations" and that he did not know very much about those that existed until the BAC was formed in 1997. As a BAC member, Tun has attended demonstrations, distributed literature, and attended meetings.

Tun testified that he believes that he has been "blacklisted" by the Burmese government for his political activity as well as for jumping ship and refusing to pay his taxes, and therefore, if he is returned to Burma, he will be arrested and tortured. He believes that the Burmese government is aware of his pro-democracy political activities in the United States because of its extensive network of informers and because of video surveillance outside of the Burmese consulate in New York, where he has attended pro-democracy demonstrations.

In addition to Tun, his cousin, Ye Lin, testified, as did Dr. Aye Kyaw, the founder of the BAC and a professor at New York University. Lin testified that he went to the Burmese consulate in New York in 1993 to renew his father's passport; while there, he asked an embassy employee friend of his about Tun. The employee told Lin that Tun had been "blacklisted" for being an anti-government activist, which Lin believed meant that Tun would be imprisoned if he returned to Burma. Lin said he was able to acquire this information only because he regularly bribed the embassy employee with alcohol, and that he did not think it would be possible to get this information in writing. Lin stated that he had been a student-activist in Burma and had known Tun in Burma, but that he did not participate in political activities with Tun.

Dr. Kyaw was accepted by the IJ as an expert on Burma. He testified that in Burma, once one is identified as a political activist, one is "blacklisted" and will be kept under close surveillance and prevented from leaving the country. Individuals placed on the blacklist are those observed participating in anti-government activities by intelligence agents, in Burma or working out of Burmese embassies abroad. Dr. Kyaw also testified that in Burma, brokers exist who, for a price, will secure false identification with which to leave the country. Dr. Kyaw further testified that he had met Tun at several BAC meetings and once, in 1997, at a demonstration in front of the Burmese consulate in New York.

In addition to his wife's letter, as documentary evidence in support of his claim, Tun presented: (1) a copy of his allegedly falsified passport; (2) photographs of himself at three protests in front of the Burmese consulate in New York in 1999; (3) documents relating to his seaman status, including certificates of completion of various seamanship courses dated October 28, 1989, and a seaman's identity card issued November 7, 1990; (4) a photo-

graph of a woman and child purporting to be his wife and daughter in Burma; (5) an affidavit from his cousin Ye Lin that tracks his hearing testimony; (6) a letter from the BAC stating that Tun had protested in front of the Burmese embassy and done various and substantial other political and organizational work with that organization in New York; (7) a copy of Dr. Kyaw's curriculum vitae; and (8) information about Burmese country conditions, including the 1996, 1998, and 1999 State Department country condition reports.

Tun's passport appeared to contradict his testimony because it was dated December 14, 1989, and listed his occupation as "cadet," whereas he testified that he had no marine experience or training until 1990. In response to questioning from the IJ, Tun explained that the date and occupation had been filled in after the fact and the passport was not actually issued in 1989. However, Tun appeared to have agreed previously that the passport was, in fact, issued to him in December 1989. Tun explained the lack of corroboration of his membership in the Dangi College Student Union by stating that, before he left Burma, he destroyed many documents to prevent discovery of his status as a political activist.

### The Immigration Judge's Decision

At the end of the hearing on March 21, 2000, the IJ issued an oral decision finding that Tun was not a credible witness and denying his claims for asylum, withholding, and relief under the Convention Against Torture. The IJ found that the only thing Tun feared about returning to Burma was criminal punishment for illegally jumping ship and refusing to pay his taxes, that he was not an activist while in Burma, and that his activities with the BAC since 1997 were contrived to support his asylum claim. The IJ noted that Tun's initial application was inconsistent in some respects with his testimony, but she credited his explanation that this was the fault of the non-lawyer who assisted him; therefore she gave "the most limited of weight" to the initial application. She noted that Tun's testimony was consistent with his second application. Yet, she still found him not credible because of the implausibility of certain aspects of his testimony and the contradictions between his testimony and the documentary evidence. Additionally, the IJ found that he failed to meet his burden of proof due to the absence of corroboration of his political activity and arrest while in Burma.

Tun's testimony, that for the two years he lived at his aunt's house he did nothing but scheme to leave Burma, was held implausible and was found to be contradicted by his passport and certificates indicating that he trained to be a seaman in 1989. Tun's explanation that the information on his passport was falsified after the fact was found implausible and not credible because he did not provide this information on direct examination or in his written application. Thus, Tun's testimony that he had no marine experience or training until 1990 was found to be contradicted by the documentary evidence. The IJ also found that Tun's actions after leaving Burma rendered implausible his claim that he had been a political activist while in Burma. She found it implausible that he would forego as many opportunities to jump ship and seek asylum as he did before finally doing so in Houston. Similarly, the IJ found Tun's explanation of why he waited so long to file for asylum implausible in light of the fact that he had family in the United States and was part of "a Burmese community which does have a strong network of advice and referral." Additionally, she found that his failure to become politically active in the United States until six years after his arrival, after he filed for

asylum, and his limited activities thereafter, indicated that his political activities here were self-serving, and contrived to support his asylum claim.

Regarding the Convention Against Torture claim, the IJ held that in light of her finding that Tun was not a political activist in Burma, his fear of punishment was based only on his jumping ship and refusing to pay his taxes; these fears could not support a claim under the Convention Against Torture because those activities were criminal, not political in nature. Moreover, she found that Tun had not carried his burden to show likely future persecution or torture on his return to Burma because he relied exclusively on speculation that he would be imprisoned, but the country conditions reports do not support a finding that common criminals, as opposed to political dissidents, are subjected to torture in Burma.

While finding that Tun's political activity in the United States was self-serving, the IJ recognized the activity occurred. However, she did not address whether the activity, together with evidence in Dr. Kyaw's testimony and the country conditions reports of the Burmese government's surveillance apparatus and repression of pro-democracy activists, constituted evidence supporting a well-founded fear of future persecution or a likelihood of future torture. In fact, in finding that there was no evidence that common criminals were tortured in Burma, the IJ recognized that the evidence established a likelihood that returning political dissidents would be tortured.

Tun timely appealed to the BIA, which summarily affirmed the IJ's decision by order dated October 31, 2002. Tun timely petitioned for review by this Court of the BIA's order. We find that the BIA's order must be vacated and the case remanded for additional proceedings before the IJ

due to the IJ's failure to address whether Tun had a well-founded fear of future persecution or was likely to be tortured on account of his political activities in the United States, and because to the extent that the IJ did address this question, her findings are not supported by substantial evidence in the record. We therefore deny in part, grant in part, and remand in part for further proceedings before the IJ. We affirm the IJ's finding that Tun failed to meet his burden to prove that he suffered past persecution.

## DISCUSSION

### I. Standard of Review

We defer to the BIA's reasonable constructions of the immigration laws. *See Guan Shan Liao v. U.S. Dep't of Justice,* 293 F.3d 61, 66 (2d Cir.2002). The BIA may properly summarily affirm the IJ's decision and thereby adopt its reasoning, *see* 8 C.F.R. § 1003.1(e)(4)(i), so long as the IJ's decision is sufficient to allow for meaningful review, *see Xusheng Shi v. Board of Immigration Appeals,* 374 F.3d 64, 66 (2d Cir.2004), and the BIA fulfilled its duty to conduct its own independent review. *Cf. Secaida–Rosales v. INS,* 331 F.3d 297, 305 (2d Cir.2003) ("The BIA is certainly not precluded from summarily affirming an IJ's decision and adopting the IJ's reasoning in doing so, as long as the IJ's decision is sufficient to allow for review and we are confident that the BIA fulfilled its duty to independently review a petitioner's case."). In such a case, we will review the IJ's decision directly. *Id.* at 305. Our review is for "substantial evidence," and we will "revers[e] only if no reasonable fact-finder could have failed to find" petitioner eligible for relief. *Ramsameachire v. Ashcroft,* 357 F.3d 169, 177 (2d Cir.2004) (internal quotation marks omitted). We will affirm if the IJ supported her finding with evidence that is "reason-

able, substantial, and probative." *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir.2000). But this Court's review is limited "to the reasoning of the IJ, and we will not search the record independently for a basis to affirm the BIA." *Secaida–Rosales*, 331 F.3d at 305. The IJ's failure to consider material evidence in the record is ground for remand. *See Tian–Yong Chen v. United States INS*, 359 F.3d 121, 128 (2d Cir. 2004).

We "afford particular deference in applying the substantial evidence standard" when reviewing an IJ's credibility findings. *Zhou Yun Zhang v. United States INS*, 386 F.3d 66, 73 (2d Cir.2004) (internal quotation marks omitted). Nevertheless, "the fact that the BIA has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review." *Ramsameachire*, 357 F.3d at 178. In particular, where the IJ's finding rests largely on credibility, we require the IJ to detail the reasoning leading to her adverse finding, by giving specific and cogent reasons for rejecting the applicant's testimony. *Secaida–Rosales*, 331 F.3d at 307. The reasons given "must bear a legitimate nexus to the finding" and must be "valid grounds," as a matter of logic, for rejecting the applicant's testimony. *Id.* (internal quotation marks omitted). We give particular deference to credibility determinations that are based on the adjudicator's observation of the applicant's demeanor, in recognition of the fact that the IJ's ability to observe the witness's demeanor places her in the best position to evaluate whether apparent problems in the witness's testimony suggest a lack of credibility or, rather, can be attributed to an innocent cause such as difficulty understanding the question. *See Zhang*, 386 F.3d at 73. On the other hand, we grant lesser deference to credibility determinations that are based on analysis of testimony as opposed to demeanor. *See Secaida–Rosales*, 331 F.3d at 307. "[W]e will reverse where [an] adverse credibility finding is based upon speculation or upon an incorrect analysis of the testimony." *Ramsameachire*, 357 F.3d at 178; *see also Secaida–Rosales*, 331 F.3d at 307 (holding that speculation and conjecture cannot support an adverse credibility finding). Where inconsistencies or implausibilities form the basis for the IJ's finding, we will review the record to determine whether the inconsistencies actually exist or the testimony was actually implausible. *See Ramsameachire*, 357 F.3d at 178; *Secaida–Rosales*, 331 F.3d at 307.

An applicant may be required to provide any reasonably available documentation to corroborate the elements of her claim, or explain why such documentation is unavailable, and an IJ may rely on the failure to do so in finding that the applicant has not met her burden of proof. *See Zhang*, 386 F.3d at 78. We review an IJ's finding that corroborative evidence was available for substantial evidence, and will not reverse unless "a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." Real ID Act of 2005, Div. B of the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Pub.L. No. 109–13, § 101(e), 119 Stat. 231, 302, 305 (May 11, 2005) (codified at 8 U.S.C. § 1252) (hereinafter, "Real ID Act") (provision made immediately applicable by *id.* § 101(h)(3)). But we may remand where the IJ has "turn[ed] down a refugee candidate for want of sufficient corroboration" without "identify[ing] the particular pieces of missing, relevant documentation" or without relying on substantial evidence in the record to find that "the documentation at issue was reasonably available to the petitioner." *Jin Shui Qiu v. Ashcroft*, 329

F.3d 140, 153 (2d Cir.2003). The IJ should also assess the applicant's reasons, if any, for not furnishing the corroboration at issue. *Diallo,* 232 F.3d at 287–88.

## II. General Principles Applicable to Claims for Asylum, Withholding of Removal, and Relief under the Convention Against Torture

### A. Asylum and Withholding of Removal

An alien seeking to establish eligibility for asylum must establish that he is a "refugee" as defined by 8 U.S.C. § 1101(a)(42), "i.e. that he has suffered past persecution on account of 'race, religion, nationality, membership in a particular social group, or political opinion,' or that he has a well-founded fear of future persecution on these grounds." *Qiu,* 329 F.3d at 148 (quoting 8 U.S.C. § 1101(a)(42)). Once an asylum applicant has established eligibility for asylum, the decision whether to grant asylum rests with the discretion of the Attorney General or Secretary of Homeland Security, *see* 8 U.S.C. § 1158(b)(1), and is generally not reviewable unless "manifestly contrary to law and an abuse of discretion," 8 U.S.C. § 1252(b)(4)(D); *see also Melendez v. United States Dep't of Justice,* 926 F.2d 211, 218 (2d Cir.1991).

 While establishing a well-founded fear of future persecution automatically establishes an applicant's eligibility for asylum, establishing past persecution creates only a rebuttable presumption of such a well-founded fear, which may be rebutted by a showing, by the preponderance of the evidence, either of sufficiently changed conditions in the country from which the applicant fled, *Qiu,* 329 F.3d at 148; 8 C.F.R. § 208.13(b)(1), (b)(1)(i)(A), or that the applicant could avoid future persecution by relocating to a different region of that country and that it would be reasonable to expect the applicant to do so,

*id.* § 208.13(b)(1)(i)(B). Absent a showing of past persecution, demonstrating a well-founded fear of future persecution has both a subjective and an objective prong. *Ramsameachire,* 357 F.3d at 178. The subjective element can be satisfied by the applicant's credible testimony that his fear is genuine. However, the objective component "is largely dependent upon the context and believability [the applicant] can establish for [his or her] claims through presentation of reliable, specific, objective supporting evidence." *Id.* (internal quotation marks omitted). An applicant is "not require[d] ... to provide evidence that there is a reasonable possibility that he or she would be singled out individually for persecution" provided the applicant proves the existence of "a pattern or practice in his or her country of nationality ... of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion," and the applicant establishes "his or her own inclusion in, and identification with, such group ...." 8 C.F.R. § 208.13(b)(2)(iii).

While an IJ's credibility finding is entitled to substantial deference, and we grant particular deference to findings based on observation of an applicant's demeanor, we are less deferential where credibility findings rest on purported inconsistencies or implausibilities in an applicant's testimony. *See Secaida–Rosales,* 331 F.3d at 307. Where inconsistencies or implausibilities form the basis for the IJ's finding, we will review the record to determine whether the inconsistencies actually exist or the testimony was actually implausible. *See Ramsameachire,* 357 F.3d at 178.

 To establish entitlement to withholding of removal an applicant must make a stronger showing than to establish

eligibility for asylum. But withholding is mandatory once entitlement is established; it may not be denied in the discretion of the Attorney General as may asylum. *See Zhang,* 386 F.3d at 70–71. To establish entitlement to withholding, an applicant must prove "that it is more likely than not that, were he deported, his 'life or freedom would be threatened' on account of" one of the protected grounds of race, religion, nationality, membership in a particular social group, or political opinion. *Qiu,* 329 F.3d at 148 (quoting 8 U.S.C. § 1231(b)(3)(A)). As with asylum, an applicant who establishes past persecution on account of a protected ground is entitled to a rebuttable presumption of a future threat to life or freedom, which may be rebutted on the same grounds of changed circumstances or a reasonable possibility of relocation to avoid persecution. 8 C.F.R. § 208.16(b)(1)(i). But, if either the applicant's fear of future threat to life or freedom is not related to the past persecution that she suffered, or the applicant did not suffer past persecution, the applicant must affirmatively prove that it is "more likely than not" that her life or freedom would be threatened by persecution on account of a protected ground, and that such persecution could not reasonably be avoided by relocation within the country. 8 C.F.R. § 208.16(b)(1)(iii), (b)(2). An applicant is "not require[d] ... to provide evidence that he or she would be singled out individually for such persecution" provided the applicant proves the existence of "a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion," and the applicant establishes her "inclusion in and identification with such group." *Id.* § 208.16(b)(2).

▮ In establishing a well-founded fear of future persecution to prove eligibility for asylum, in contrast to withholding, an applicant need not prove that future persecution is more likely than not. Rather, to establish that her subjective fear is well-founded, an applicant need only show a "reasonable possibility" of future persecution. *Matter of Mogharrabi,* 19 I. & N. Dec. 439, 442, 1987 WL 108943 (BIA 1987) (quoting *INS v. Stevic,* 467 U.S. 407, 424–25, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984)). In other words, the applicant must show that "a reasonable person in his circumstances would fear persecution." *Id.* at 445; *accord Carcamo–Flores v. INS,* 805 F.2d 60, 68 (2d Cir.1986). The Supreme Court has stated that a showing of a ten percent likelihood of persecution could suffice to establish that an applicant's fear is well-founded. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 431, 440, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

▮ The requirement that an applicant show that her fear of persecution is well-founded may be broken up into four elements: the applicant must provide evidence (1) that he has a belief or characteristic that a persecutor seeks to overcome by means of some mistreatment, that the persecutor has the (2) capability and (3) inclination to impose such mistreatment, and (4) that the persecutor is, or could become, aware of the applicant's possession of the disfavored belief or characteristic. *See Mogharrabi,* 19 I. & N. Dec. at 446. Each of these elements is to be evaluated in light of the appropriate burden of proof: a "clear probability" in the withholding context, and only "a reasonable possibility" in the asylum context. *Id.* at 446–47.

## B. *Relief Under the Convention Against Torture*

### 1. *The Convention Itself*

In 1984, a process began by which the longstanding procedures for seeking the

protections of asylum and withholding of removal would ultimately be supplemented by the protections of the Convention Against Torture, which was adopted and opened for signature, ratification, and accession by the United Nations General Assembly on December 10, 1984, and entered into force on June 26, 1987. The Convention defines "torture" as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him [or her] or a third person information or a confession, punishing him [or her] for an act he [or she] or a third person has committed or is suspected of having committed, or intimidating or coercing him [or her] or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Convention Against Torture art. 1, ¶ 1. Article 3 of the Convention prohibits any state party to the Convention from "expel[ling], return[ing] ... or extradit[ing] a[ny] person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture," and provides that the determination of whether such grounds exist is to be made "tak[ing] into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights." *Id.* art. 3.

### 2. The Regulatory System Today

Regulations promulgated by the Attorney General in 1999 established a procedure for asserting claims to relief under the Convention. *See* Regulations Concerning the Convention Against Torture, 64 Fed.Reg. 8478–01 (Feb. 19, 1999) (codified at 8 C.F.R. §§ 208.16(c), 208.17–18). The regulations adopted the Convention's definition of "torture" in Article 1 practically verbatim, merely inserting female pronouns to render its language gender-neutral. *See* 8 C.F.R. § 208.18(a)(1). They incorporated that Article's language providing that "[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions," *id.* § 208.18(a)(3), adding, in accord with the Senate's understanding, that "lawful sanctions" "do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture," *id.* In order to establish entitlement to relief under the Convention, the regulations, again in accordance with the Senate's understanding, place on the applicant the burden to prove that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal," *id.* § 208.16(c)(2) & (4). In determining whether the applicant has met this burden, relevant evidence that should be considered includes any evidence that the applicant has been tortured in the past, evidence that the applicant could relocate to another part of the country where torture would be unlikely, evidence of "gross, flagrant or mass violations of human rights within the country of removal," and any other relevant information regarding conditions in that country. *Id.* § 208.16(c)(3).

 The Convention Against Torture provides significantly different protections from those provided under the traditional asylum and withholding provisions descended from the 1951 Refugee Convention. *See, e.g., Ramsameachire,* 357 F.3d at 184–85 (noting that alien could qualify for relief under the Convention Against Torture but not for asylum or withholding,

or vice versa, and so claims under the Convention must always be considered independently of claims for asylum or withholding). Individuals are protected against torture regardless of whether such torture would be on account of one of the traditional protected grounds of race, religion, nationality, membership in a particular social group, or political opinion. In accord with the Senate's understanding, even torture sanctioned by the alien's country of origin for his criminal conduct will sometimes establish entitlement to relief. *See Mu–Xing Wang v. Ashcroft*, 320 F.3d 130, 134 (2d Cir.2003) ("[A]n alien is not entitled to CAT relief unless he can prove that, upon being returned to his country of origin, he is more likely than not to suffer intentionally-inflicted cruel and inhuman treatment that either (1) is not lawfully sanctioned by that country or (2) is lawfully sanctioned by that country, but defeats the object and purpose of CAT."). On the other hand, torture requires proof of something more severe than the kind of treatment that would suffice to prove persecution. *See, e.g., Chen*, 359 F.3d at 128 (stating that "perse-

cution" in the asylum context means that, although "the conduct must rise above mere harassment," the term includes "more than threats to life or freedom; non-life threatening violence and physical abuse also fall within this category" (internal quotation marks omitted)); *Liao*, 293 F.3d at 67 ("Persecution" has been held to include "[v]arious types of conduct ... such as, for example, the deliberate imposition of a substantial economic disadvantage"); *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir.2002) (stating that "[t]ypes of actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." (internal quotation marks omitted)).

### III. The IJ's Finding that Tun Failed to Prove Past Persecution

■ The IJ's discussion of past persecution was in some respects problematic, and her adverse credibility finding rested to a great extent on logically flawed analysis and speculation unsupported by substantial evidence.[2] As such, the adverse

---

2. For example: No record evidence supported the IJ's finding that Tun was part of a strongly cohesive community of Burmese who would be expected to inform him about asylum procedures, and that therefore his explanation that he waited as long as he did to file for asylum because he was unaware of the procedure was implausible. Further, the IJ's finding that Tun's failure to jump ship earlier rendered his story that he left Burma to flee political persecution implausible was not logically sound. Tun had already succeeded in fleeing Burma, and nothing in the record would indicate that he had any motive to leave the ship before he was informed that the crew was being returned to Burma.

The IJ stated that the years between Tun's arrival in 1991 and 1997 were "particularly explosive" in Burma, and that "many true dissidents and activists here in the United States voiced their support against the military regime in power there." According to

the country condition reports, in 1996, all universities in Burma were closed following a series of student demonstrations, and remained closed into 1999, numerous members-elect of the Burmese parliament were imprisoned, and "a series of totalitarian decrees" was issued by the Burmese government which intensified restrictions on freedom of speech. Thus, 1996 clearly seems to be a year during which conflict between the Burmese government and pro-democracy forces reached a peak of intensity. Moreover, this peak seems to have been reached very late in 1996. In fact, student demonstrations that led to the closing of the universities broke out in December 1996 following the Burmese government's prohibition of public pro-democracy meetings that had been held at Aung San Suu Kyi's residence. Therefore, Tun's assertion that he first became aware of Burmese pro-democracy activists in the U.S. in early 1997 is plausible. It was not, in itself, improper

credibility finding here would not provide a basis for us to affirm the IJ's finding that Tun failed to prove past persecution. However, the IJ's alternative finding is sufficiently supported by substantial evidence: Tun failed to sustain his burden of proving past persecution because he failed to present reasonably available corroborative evidence. Therefore, based on this alternative ground, we affirm the IJ's finding that Tun failed to prove past persecution.

■■■ The IJ properly relied on the implausibility of Tun's testimony about (1) his passport, and (2) his two years in hiding at his aunt's house. Regarding the passport, Tun's explanation of the discrepancy was implausible because it rested on an implausible chronology. Tun stated that after he purchased his passport from a broker, the broker arranged for him to enter seamanship training in early 1990, and that after he finished this training the broker went back and altered the passport to indicate that he had already trained to be a seaman in 1989. The IJ did not err in finding this chronology implausible, as there was no apparent reason for such an alteration. While Tun is correct that his admitting to presenting false papers cannot by itself serve as the basis for an adverse credibility finding and denial of his application, where he provides an explanation that this was necessary in order to escape persecution, see Matter of Pula, 19 I. & N. Dec. 467, 473–74, 1987 WL 108948 (BIA 1987), the IJ could properly rely on the implausibility of that explanation as a basis for her adverse credibility finding. With regard to the two years Tun spent at his aunt's house, the IJ properly found implausible Tun's claim to have been a political activ-

ist, considering, *inter alia*, Tun's admission of political inactivity during those two years and the lack of any corroboration for the claim that he had been arrested.

Tun failed to provide any corroboration whatsoever of the claimed persecution or the political activities that allegedly motivated it. Fulfilling her obligations under *Zhang* and *Diallo*, the IJ identified the missing information; since the record makes clear that the information was reasonably available to Tun and that Tun failed to provide convincing evidence that the information was unavailable, this sufficed to support the IJ's finding. *Zhang*, 386 F.3d at 78; *see also* Real ID Act § 101(e) (codified at 8 U.S.C. § 1252) (providing that a court may reverse an IJ's finding that corroborating evidence was reasonably available if "a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.").

Here, it is clear that Tun's parents were both living in New York when his hearing took place there; yet, neither of them testified or provided a written statement. If Tun's claims were true, his parents could have provided corroboration for, *inter alia*, the allegations that Tun had been arrested by the Burmese military on account of his politically motivated activities, that he was kept in jail for some two weeks, and that they could not secure his release from jail unless he agreed to cease his political activity. And Tun's wife's letter stated that the military was looking for him, but did not corroborate any of the earlier events that motivated it to do so.

It might be plausible that Tun would be unable to provide statements from corroborating witnesses regarding his activities in Burma, and he might not be expected to

---

for the IJ to rely on the suspicious quality of the fact that Tun's political awakening in the United States conveniently followed his filing of an asylum application. However, this find-

ing was infected by the error of relying on unsupported speculation regarding the history of Burma and Burmese–American activism.

do so, if the only people aware of these activities were other political activists in Burma or people present in the United States illegally and subject to return to Burma. Such people—Tun's brother, for example, who was apparently in peril of removal—may understandably desire to keep a low profile. But Tun's parents are legal permanent residents of the United States. Thus, the IJ was entitled to rely on Tun's lack of reasonably available corroborative statements from his parents in finding that he had not met his burden to prove past persecution.

## IV. The IJ's Failure to Consider Whether Tun's Political Activities in the United States Gave Rise to a Well–Founded Fear of Future Persecution.

As an alternative basis for his eligibility for asylum and entitlement to withholding of removal and relief under the Convention Against Torture, Tun has consistently argued that it is likely he would be persecuted or tortured on his return to Burma solely on account of his political activities in the United States. Respondent INS argues that Tun failed to offer "convincing evidence that the Burmese government knows of or cares about Tun's ... political activity here." (Red 35) It relies on *Bahramnia v. United States INS,* 782 F.2d 1243 (5th Cir.1986), for the rejection of a petitioner's claim of a well-founded fear of persecution on account of political activities since arriving in the United States. We are unpersuaded by Respondent's argument for several reasons.

In *Bahramnia,* an Iranian supporter of the deposed Shah claimed fear of persecution by the Khomeini regime if returned to Iran. However, in that case there was no evidence of either an inclination to persecute similarly situated activists, *see* 782 F.2d at 1248 (noting lack of evidence that Iranian authorities would want to persecute someone who only attended meetings and demonstrations), or an extensive surveillance apparatus, *see id.,* or an interest in Bahramnia himself, *see id.* ("The evidence does not suggest that Bahramnia has been identified to Iranian authorities as an opponent of that regime, or that his activities in this country since 1983 have been so visible or notable so as to come to the attention of those officials.").

Here, in contrast, there was evidence that the Burmese government conducts surveillance of dissident activities in this country and was aware of the activities of Tun himself. There is no dispute that, starting in 1997, Tun engaged in pro-democracy dissident activities in the United States with other Burmese exiles, including open participation in the activities of the Burma Action Committee and attendance at various demonstrations in front of the Burmese consulate in New York City. At his hearing, Tun presented testimony from Dr. Kyaw, the founder of the Burma Action Committee and a professor at New York University, who the IJ credited as an expert on conditions in Burma. Dr. Kyaw testified that the Burmese government conducts extensive intelligence-gathering and surveillance on groups of Burmese expatriates who are politically active against the Burmese government, including photographing and videotaping those present at demonstrations at the Burmese consulate in New York and including infiltrating or recruiting members of expatriate activist organizations to secure information about the identities of their members. *See also* 1999 U.S. Dep't of State, 1999 Country Reports on Human Rights Practices: Burma, at 7 (2000) (stating that "[t]hrough its extensive intelligence network and administrative procedures, the [Burmese] Government systematically monitored the travel of all citizens,

and closely monitored the activities of many citizens, particularly those known to be politically active"). The 1996 State Department report states that "[r]eturnees should expect that authorities will take severe action against them if they engage[d] in activities which the [government] considers undesirable." And, Tun's wife's letter says specifically that the military agents who came to her house told her that they were aware of Tun's political activities in the United States. Yet, the IJ's decision is silent on the question of whether this record evidence establishes a reasonable likelihood that Tun will be identified as a political dissident on his return to Burma.

Under the Refugee Protocol and the 1980 Refugee Act, the United States as a nation is committed and bound to protect "refugees" from persecution by providing protections to prevent the return of a refugee to her country of nationality where she is unwilling to return because of a well-founded fear of persecution on account of a protected ground such as a political opinion. Refugee Protocol arts. 1, 33; 1980 Refugee Act §§ 101(a), 201. Accordingly, the Ninth Circuit has held that an applicant may establish eligibility for asylum or entitlement to withholding solely on the basis of a likelihood of persecution on account of her political activities since arriving in the United States. *See, e.g., Ghadessi v. INS*, 797 F.2d 804, 807–08 (9th Cir.1986) (holding petitioner could establish well-founded fear of persecution on account solely of involvement in activities in opposition to Iranian government since arrival in U.S.); *Sakhavat v. INS*, 796 F.2d 1201, 1203–04 (9th Cir.1986) (same).

We agree with the Ninth Circuit, as these conclusions are implicitly supported by the statutory and regulatory provisions that impose deadlines for the filing of applications for asylum. In general, the statute requires that an application for asylum be made within one year of the alien's arrival in the United States, *see* 8 U.S.C. § 1158(a)(2)(B), but it relaxes that deadline for "changed circumstances which materially affect the applicant's eligibility for asylum," *id.* § 1158(a)(2)(D). The term "changed circumstances" encompasses not only changes in the conditions in the applicant's country of nationality, *see* 8 C.F.R. § 208.4(a)(4)(A), but also "activities the applicant becomes involved in outside the country of feared persecution that place the applicant at risk", 8 C.F.R. § 208.4(a)(4)(i)(B). Thus, we think it clear that an asylum application may properly be based on the alien's political activities after her arrival in the United States.

We also note that Tun was not required to establish that the Burmese government was aware of him as an individual. Under 8 C.F.R. §§ 208.13(b)(2)(iii) and 208.16(b)(2) it sufficed to establish petitioner's eligibility for asylum and entitlement to withholding for petitioner to prove that he was a pro-democracy activist and that the Burmese government has a pattern or practice of persecuting similarly situated pro-democracy activists. Here, the record contains extensive evidence that the Burmese military regime maintains a thorough and systematic intelligence-gathering and surveillance apparatus directed specifically at deterring pro-democracy activities of Burmese citizens both inside and outside of Burma.

In sum, the IJ erred by failing to evaluate Tun's evidence to determine (1) whether the Burmese government exhibited a pattern or practice of persecuting others who were equally active in the Burmese pro-democracy movement as was Tun and (2) whether Burmese government officials were likely to become aware of Tuns' political activities. Moreover, the IJ's finding that Tun's political activities in the United

States were not motivated by a genuine political opinion, but were rather merely "self-serving," was not a sufficient alternative ground to support the IJ's decision because there is no requirement that the political activities that give rise to a risk of persecution be motivated by actual political beliefs. Thus, remand is .required to allow the IJ to consider evidence to determine whether Tun had a well-founded fear of persecution on account of pro-democracy political activities and to determine whether Burmese government officials were likely to become aware of Tun's political dissident activities in the United States.

## V. The IJ's Denial of Relief Under the Convention Against Torture

The IJ erred as a matter of law in rejecting Tun's claim under the Convention Against Torture on the basis that his only fear was of torture in retaliation for violating criminal laws, and not in retaliation for his political activities. As noted above, while the Convention as originally drafted does exempt "pain or suffering arising only from, inherent in or incidental to lawful sanctions" from the definition of "torture," Convention Against Torture art. 1, ¶ 1, the Senate's understanding that "a State Party could not through its domestic sanctions defeat the object and purpose of the Convention to prohibit torture," 136 Cong. Rec. S17491, ¶ II(c), has been incorporated into this country's refugee law. *See* 8 C.F.R. § 208.18(a)(3). Thus, punitive treatment that is feared as retaliation for criminal acts or as part of a system of sanctions lawful in the proposed country of removal may nevertheless constitute grounds for relief under the Convention if that punitive treatment would "defeat the object and purpose of the Convention to prohibit torture." Such a limitation on relief as that assumed by the IJ would similarly contravene Congress's explication

of the policy of the Convention as "not to ... effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note.

The IJ properly relied in the alternative on the total absence from the record of evidence that individuals who have failed to pay their taxes or jumped ship are likely to be tortured on return to Burma. However, for the same reasons that the IJ erred in failing to consider whether Tun had a well-founded fear of persecution in retaliation for his political activities in the United States, the IJ erred in failing to consider whether Tun established that he would likely be tortured on return to Burma in retaliation for those activities. While the IJ found that Tun lacked a genuine political belief, the IJ failed to address whether he is likely to be identified as someone with politically dissident views and consequently tortured, despite the evidence that Tun presented that such identification is likely because of the extensive surveillance activities conducted by the Burmese government of politically active Burmese exiles. *See also* 8 C.F.R. § 208.16(c)(3) (IJ must consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" in determining whether torture is likely there). Because entitlement to relief under the Convention may be proved by purely objective evidence that torture is likely, and does not require proof of a subjective component, the genuineness or lack thereof of Tun's political beliefs is irrelevant to his entitlement to relief under the Convention. *See Ramsameachire*, 357 F.3d at 184. It would be sufficient to establish that the Burmese authorities are likely to perceive Tun as a dissident and torture him for that reason, regardless of

whether his dissent was genuine or "self-serving."

## CONCLUSION

For the foregoing reasons, Tun's petition for review is denied in part, granted in part, and remanded. The BIA's order affirming the IJ's denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture is vacated, and the case is remanded for further proceedings consistent with this opinion.