BARRINGTON D. PARKER, Circuit Judge,
joined by Judges CALABRESI, POOLER, and SACK, dissenting:
I join Judge Sack’s, Judge Pooler’s, and Judge Calabresi’s opinions in full. My point of departure from the majority is the text of the Convention Against Torture, which provides that “[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture.” United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment art. 2, cl. 2, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T. S. 85' (“Convention Against Torture”). Because the majority has neglected this basic commitment and a good deal more, I respectfully dissent.
Maher Arar credibly alleges that United States officials conspired to ship him from American soil, where the Constitution and our laws apply, to Syria, where they do not, so that Syrian agents could torture him at federal officials’ direction and behest. He also credibly alleges that, to accomplish this unlawful objective, agents of our government actively obstructed his access to this very Court and the protections established by Congress. See 8 U.S.C. § 1252(a)(2)(D) (providing for judicial review of constitutional claims or questions of law raised by an order of removal).
While I broadly concur with my colleagues who dissent, I write separately to underscore the miscarriage of justice that leaves Arar without a remedy in our courts. The majority would immunize official misconduct by invoking the separation of powers and the executive’s responsibility for foreign affairs and national security. Its approach distorts the system of checks and balances essential to the rule of law, and it trivializes the judiciary’s role in *611 these arenas. To my mind, the most depressing aspect of the majority’s opinion is its sincerity.
A primary theme of the majority’s approach is deference to executive authority, especially in a time of national unrest, turmoil, or danger. The conduct of foreign policy and the maintenance of national security are surely executive and legislative powers. Yet those powers are not limitless. The bounds in both wartime and peacetime are fixed by the same Constitution. See Ex parte Milligan, 71 U.S. (4 Wall.) 2, 120-21, 18 L.Ed. 281 (1866). Where appropriate, deference to the coordinate branches is an essential element of our work. But there is, in my view, an enormous difference between being deferential and being supine in the face of governmental misconduct. The former is often necessary, the latter never is. At the end of the day, it is not the role of the judiciary to serve as a help-mate to the executive branch, and it is not its role to avoid difficult decisions for fear of complicating life for federal officials. Always mindful of the fact that in times of national stress and turmoil the rule of law is everything, our role is to defend the Constitution. We do this by affording redress when government officials violate the law, even when national security is invoked as the justification. See U.S. Const. art. I, § 9, cl. 2; Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).
Notably, the majority opinion does not appear to dispute the notion that Arar has stated an injury under the Fifth Amendment of the Constitution. That is heartening, because, by any measure, the notion that federal officials conspired to send a man to Syria to be tortured “shocks the conscience.” Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). What is profoundly disturbing, however, is the Court’s pronouncement that it can offer Arar no opportunity to prove his case and no possibility of relief. This conclusion is at odds with the Court’s responsibility to enforce the Constitution’s protections and cannot, in my view, be reconciled with Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc., 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which remains good law to this day. See also Davis v. Passman, 442 U.S. 228, 248-49, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (declaring Bivens remedy for alleged Fifth Amendment violations). The majority is at odds, too, with our own State Department, which has repeatedly taken the position before the world community that this exact remedy is available to torturé victims like Arar.[1] If the Constitution ever implied a damages remedy, this is such a case — where executive officials allegedly blocked access to the remedies chosen by Congress in order to deliver a man to known torturers.
The Court’s hesitation today immunizes official conduct directly at odds with the express will of Congress and the most basic guarantees of liberty contained in the Constitution. By doing so, the majority risks a government that can interpret the law to suits its own ends, without scrutiny. See Memorandum from John Yoo, Deputy Assistant Att’y Gen., & Robert J. Delahunty, Special Counsel, to William J. Haynes II, Gen. Counsel, Dep’t of Defense, Jan. 9, 2002, in The Torture Papers: The Road to Abu Ghraib 38 (Karen J. Greenberg & *612 Joshua L. Dratel eds., 2005); The Federalist No. Jp8, at 281 (James Madison) (Clinton Rossiter ed., 1961) (warning against the “tyrannical concentration of all the powers of government in the same hands”). Contrary to the majority, I believe that the Constitution affords Arar a remedy should he prove his sobering allegations, and that his case should be permitted to proceed.
I
The majority discovers myriad reasons to “hesitate” in the face of Arar’s complaint that federal officials conspired to send him to Syria to be tortured. Its principal reason, however, is that permitting such an action “would have the natural tendency to affect diplomacy, foreign policy and the security of the nation.” Maj. Op. at 574. This view of the separation of powers, which confines the courts to the sidelines, is, in my view, deeply mistaken; it diminishes and distorts the role of the judiciary especially during times of turmoil.
When presented with an appropriate case or controversy, courts are entitled— indeed obliged — to act, even in instances where government officials seek to shield their conduct behind invocations of “national security” and “foreign policy.” See, e.g., Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006); Reid v. Covert, 354 U.S. 1, 23-30, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); Youngstown, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153. Compare Ex parte Quirin, 317 U.S. 1, 19, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (observing the “duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty”), with Maj. Op. at 574 (suggesting that Arar’s allegations do not trigger the Court’s “unflagging duty to exercise [its] jurisdiction”). This authority derives directly from the Constitution and goes hand in hand with the responsibility of the courts to adjudicate all manner of cases put before them.
The active management of foreign policy and national security is entrusted to the executive and legislative branches. See U.S. Const. art. I, § 8; art. II, § 2. But this does not mean that executive and legislative officials are left to adhere to constitutional boundaries of their own accord, without external restraint. That is the job of the courts. As Madison declared when he introduced the Bill of Rights to Congress:
If [these amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights.
1 Annals of Cong. 439 (Joseph Gales ed., 1834). The Constitution established three co-equal branches of government, each operating as a check upon the others. In this way, the separation of powers was designed as a limiting principle of government — not to silence any one branch, as the majority implies here, but to enlist each as “a sentinel over the public rights.” The Federalist No. 51, at 290 (James Madison) (Clinton Rossiter ed., 1961).
The majority treats the separation of powers as a reason for the Court to abstain in this case — in reality, it is precisely the opposite. The executive’s core responsibility for foreign policy does not negate the judiciary’s duty to interpret and enforce constitutional limits. “[E]ven the war power does not remove constitutional limitations safeguarding essential liber *613 ties.” Home Bldg. & Loan Ass’n v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Boumediene v. Bush, - U.S. -, 128 S.Ct. 2229, 2246, 171 L.Ed.2d 41 (2008). One branch impermissibly intrudes upon another not when it fulfills its prescribed role but when it seeks to exercise authority assigned to its coordinate branches. See Youngstoum, 343 U.S. at 587-89, 72 S.Ct. 863 (holding that the President had exceeded his executive powers when he assumed the “law making power” entrusted to “Congress alone in both good and bad times”); Bowsher v. Synar, 478 U.S. 714, 726, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (holding that Congress may not remove executive officers except by impeachment); The Federalist No. 47 at 270-71 (James Madison) (Clinton Rossiter ed., 1961) (“[W]here the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution, are subverted.”) (emphasis removed). The defendants before us could, of course, be fully exonerated in the end, but it is the Court’s role to determine the legality of their actions for itself.
In this case, Arar does not ask the Court to assume any executive functions— to dispatch diplomatic representatives, negotiate treaties, or oversee battlefield decisions. Likewise, the suit does not implicate his release or rescue from Syrian custody. Rather, Arar asks the Court to perform a core judicial function: To interpret the laws and Constitution as they apply to detailed allegations of official misconduct on American soil. And he petitions for a familiar judicial remedy: money damages. See Bivens, 403 U.S. at 395, 91 S.Ct. 1999. Such a suit does not represent judicial interference in executive functions, as the majority would have it, but rather an effort to keep executive power within constitutional limits. See Buckley v. Valeo, 424 U.S. 1, 121, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (recognizing that each branch necessarily participates in the affairs of the others); Mistretta v. United States, 488 U.S. 361, 380-81, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Respectfully, I believe the majority’s deference dissolves the very protections and liberties that the separation of powers was intended to guarantee.
II
The Supreme Court has repeatedly made clear that the separation of powers does not prevent the judiciary from ruling on matters affecting national security, and that the courts are competent to undertake this task. See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 535, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (“[W]e necessarily reject the Government’s assertion that separation of powers principles mandate a heavily circumscribed role for the courts” in establishing procedures for designating enemy combatants); New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (holding that asserted military interests could not justify prior restraint of the press); Youngstown, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153; Ex parte Quirin, 317 U.S. at 19, 63 S.Ct. 2.[2]
*614 Courts routinely handle classified materials and exercise judgment about both the credibility and legal significance of the security interests asserted by the government. See Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C. §§ 1801-1811, 1821-29, 1841-46, 1861-62 (2006); Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(4)(B) & (b)(1) (2006), amended by Open FOIA Act of 2009, Pub. L. No. 111-83, 123 Stat. 2142, 2184 (2009); Classified Information Procedures Act (CIPA), 18 U.S.C.App. III §§ 1-16; Boumediene v. Bush, — U.S. -, 128 S.Ct. 2229, 2261, 171 L.Ed.2d 41 (2008) (“The Government presents no credible arguments that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees’ claims.”); United States v. United States District Court (Keith), 407 U.S. 297, 320, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (“We cannot accept the Government’s argument that internal security matters are too subtle and complex for judicial evaluation.”). These cases belie the majority’s notion that the courts lack authority or competency to assess Arar’s claims. “What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions.” Sterling v. Constantin, 287 U.S. 378, 401, 53 S.Ct. 190, 77 L.Ed. 375 (1932).
The courts have a duty to scrutinize unilateral assertions of security and secrecy because the government’s account has, in many of these cases, been overblown. Recent disclosures suggest that the military secrets so fiercely guarded in United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) — the Supreme Court’s seminal state secrets case — may well have posed no threat to national security. See Herring v. United States, 2004 WL 2040272, at *5 (E.D.Pa. Sept.10, 2004), aff'd, 424 F.3d 384 (3d Cir.2005) (finding no deliberate fraud upon the court, but noting “the apparent dearth of sensitive information in the accident investigation report and witness statements”); Louis Fisher, In the Name of National Security: Unchecked Presidential Power and the Reynolds Case 166-69 (2006).
A similar truth has emerged from the Pentagon Papers case, New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Although the government argued to the Supreme Court that publication posed a “grave and immediate danger to the security of the United States,” former Solicitor General Griswold has since acknowledged that the executive’s primary concern was “not with national security, but rather with governmental embarrassment.” Erwin N. Griswold, Secrets Not Worth Keeping, Wash. Post, Feb. 15, 1989, at A25; cf. Office of the Attorney General, Mem. on Policies and Procedures Governing Invocation of the State Secrets Privilege 2 (Sept. 23, 2009) (issuing revised guidelines and clarifying that the Department of Justice “will not defend an invocation of the [state secrets] privilege in or *615 der to ... prevent embarrassment to a person, organization, or agency of the United States government”). The appropriate tools for evaluating national security concerns are already firmly established in our law — namely, the state secrets privilege and CIPA. They do not require wholesale abstention by the courts.
Indeed, a number of cases in which courts have acceded in this way, relying on bald appeals to national security, have proven deeply troubling in retrospect. The Supreme Court’s decisions upholding convictions under the Sedition Act of 1918 are regarded as indefensible today. See Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Debs v. United States, 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566 (1919); Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919); Morse v. Frederick, 551 U.S. 393, 442, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (Stevens, J., dissenting) (observing that Justice Holmes’ dissent in Abrams has “emphatically carried the day”). More recently, the dire warnings issued to justify the indefinite detention of enemy combatants and forestall further court review have also drawn stern rebuke. In Padilla v. Hanft, 432 F.3d 582, 584-587 (4th Cir.2005), the Fourth Circuit observed that the government had “steadfastly maintain[ed] that it was imperative in the interest of national security” to hold Padilla in military custody for three and a half years. Yet officials abruptly changed course on the doorstep of Supreme Court review, seeking to move Padilla into criminal custody, at a “substantial cost to the government’s credibility before the courts.” Id. at 584. See also Brief for Respondents, Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (No. 03-6696) (arguing that military necessity required Hamdi’s indefinite detention, yet releasing him to Saudi Arabia seven months later).
Finally, contrary to the majority’s suggestion, the courts require no invitation from Congress before considering claims that touch upon foreign policy or national security. See Maj. Op. at 564-65, 576-77, 582. In fact, the Supreme Court has demonstrated its willingness to enter this arena against the express wishes of Congress. In Boumediene v. Bush, — U.S. -, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), the Supreme Court rebuffed legislative efforts to strip the courts of jurisdiction over detainees held at Guantanamo Bay. It held that the writ of habeas corpus extended to the naval base, and that neither Congress nor the executive branch could displace the courts without formally suspending the writ. Importantly, it did so despite the fact that this exercise of judicial power plainly affected the executive’s detention of hundreds of enemy combatants and a centerpiece of the war on terror. The Court recognized that habeas proceedings “may divert the attention of military personnel from other pressing tasks” but refused to find these concerns “dispositive.” Id. at 2261. Scores of decisions have since followed this lead. See, e.g., Al Rabiah v. United States, 2009 WL 3048434 (D.D.C. Sept.17, 2009); Ahmed v. Obama, 613 F.Supp.2d 51 (D.D.C.2009). Courts cannot blithely accept every assertion of national security at face-value, and they are entitled to enforce constitutional limits by scrutinizing such claims.
Ill
Although Arar credibly alleges mistreatment in both the United States and Syria, the circumstances of his detention on American soil are summarily excluded from the majority’s Bivens analysis. Instead, the Court concludes that Arar has not pleaded these allegations with the factual detail required by Bell Atlantic Corp. *616 v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). See Maj. Op. at 569-70. Consequently, it dismisses Claim Pour and proceeds as though the challenged conduct is strictly extraterritorial.[3] This conclusion goes far beyond any pleading rule we are bound to apply, and it is inconsistent with both Rule 8 of the Federal Rules of Civil Procedure and recent Supreme Court decisions.
Even after Ashcroft v. Iqbal, — U.S. -, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), which dismissed discrimination claims against policymakers on account of inadequate pleading, Claim Four readily exceeds any measure of “plausibility.” Claim Four seeks to hold Defendants John Ashcroft, Larry Thompson, Robert Mueller, James Ziglar, J. Scott Blackman, Edward McElroy, and John Does 1-10 responsible for the extreme conditions under which Arar was held in the United States.[4] While the majority finds that Arar failed to allege the requisite “meeting of the minds” necessary to support a conspiracy, see Maj. Op. 569, it ignores the fact that Arar pleaded multiple theories of liability. Formal conspiracies aside, he also alleges that the defendants commonly aided and abetted his detention and removal — that is, that the defendants were personally involved in his mistreatment both in the United States and abroad. See Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir.2003) (A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or (4) deliberate indifference to the rights of others); Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir.2001).
In support of his claim for mistreatment and due process violations while in American custody, Arar includes factual allegations that are anything but conclusory. Indeed, he provides as much factual support as a man held incommunicado could reasonably be expected to offer a court at this stage. The complaint alleges that Defendant McElroy was personally involved *617 in Arar’s failure to receive the assistance of counsel. See Compl. ¶43. It alleges that Defendants Blackman and Thompson personally approved Arar’s expedited transfer from the United States to Syria, implicating these officials in his inability to access the courts. Id. ¶¶ 15, 47-48. And it recounts statements by Arar’s American interrogators that they were discussing his situation with “Washington D.C.” Id. ¶ 45; see also Dep’t of Homeland Security, Office of the Inspector General, The Removal of a Canadian Citizen to Syria (“OIG Report”) at 11 (reporting that DOJ and INS officials in Washington, D.C. learned of Arar’s apprehension on the evening of Thursday, September 26, 2002, 12 days before he was rendered to Syria via Jordan). More broadly, Arar details the harsh conditions under which he was held, including shackling, strip searches, administrative segregation, prolonged interrogation, and a near communications blackout. See id. ¶¶ 29-47. Notably, these are not “[tjhreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.” Iqbal, 129 S.Ct. at 1949. They easily satisfy the requirements of both Iqbal and also Rule 8, whose “short and plain statement” remains the baseline for notice-pleading. See Fed.R.Civ.P. 8(a)(2).
Moreover, as Iqbal made clear, plausibility is “context-specific,” requiring the reviewing court “to draw on its judicial experience and common sense.” Iqbal, 129 S.Ct. at 1950. There, the Supreme Court rejected Iqbal’s discrimination claims against high-ranking federal officials because his complaint lacked sufficient factual allegations supporting the inference of discriminatory intent. Id. at 1952. Central to the majority’s decision was the fact that these officials faced a devastating terrorist attack “perpetrated by 19 Arab Muslim hijackers.” Id. at 1951. Against this backdrop, the majority found Iqbal’s claim overwhelmed by the “obvious alternative explanation” — that his arrest stemmed from a “nondiscriminatory intent to detain aliens ... who had potential connections to those who committed terrorist acts.” Id. at 1951 (quoting Twombly, 550 U.S. at 567, 127 S.Ct. 1955). Apparently having their own views about the defendants’ state of mind, the majority simply found Iqbal’s discrimination claim incredible.
Plausibility, in this analysis, is a relative measure. Allegations are deemed “conclusory” where they recite only the elements of the claim. They become implausible when the court’s commonsense credits far more likely inferences from the available facts. See Harris v. Mills, 22 A.D. 379, 572 F.3d 66, 71-72 (2d Cir.2009). Plausibility thus depends on a host of considerations: The full factual picture presented by the complaint, the particular cause of action and its elements, and the available alternative explanations. See Iqbal, 129 S.Ct. at 1947-52. As Rule 8 implies, a claim should only be dismissed at the pleading stage where the allegations are so general, and the alternative explanations so compelling, that the claim no longer appears plausible. See Fed.R.Civ.P. 8(a); Twombly, 550 U.S. at 556, 127 S.Ct. 1955 (requiring simply “enough fact to raise a reasonable expectation that discovery will reveal evidence” supporting the claims).
Arar’s claim readily survives this test, particularly in light of the Court’s obligation to “draw[] all reasonable inferences in the plaintiffs favor” on a motion to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002). The notion that high-ranking government officials like Defendants Ashcroft and Mueller were personally involved in setting or approving the conditions under which suspected terrorists would be held on American soil — and even oversaw *618 Arar’s detention and removal — is hardly far-fetched. Arar’s arrival at JFK airport was a significant event in September 2002, triggering all manner of security responses. See, e.g., Compl. ¶ 45; OIG Report at 11, 15 (citing “high-level interest in Arar in Washington, DC”); id. at 30 n. 31 (describing the four-vehicle convoy in which Arar was transported, including nine INS officers equipped with their service weapons, Remington 870 shotguns, M-4 rifles, helmets, and ballistic vests). The fact that Arar was covertly transferred to Syria, by itself, indicates involvement at the highest levels of government.
In contrast to Iqbal, it is the alternative here that is difficult to fathom. To think that low-level agents had complete discretion in setting the conditions for holding a suspected member of al Qaeda defies commonsense. It requires the Court to believe that, while high-level officials were involved in arranging Arar’s removal to Syria — a premise the majority does not question[5] — they were oblivious to the particulars of his detention. The majority was, of course, bound to credit all reasonable inferences from the allegations in the complaint, understanding that their factual basis would be thoroughly tested in discovery. See Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (a court must proceed “on the assumption that all the allegations in the complaint are true (even if doubtful in fact)”). The inference that, in 2002, high-level officials had a role in the detention of a suspected member of al Qaeda requires little imagination.
Further, unlike Iqbal, Arar’s due process claims do not ask the Court to speculate about the mental state of government officials. Rather, Claim Four rests on objective factors — the conditions of confinement and his access to the courts — that are independent of motive. Compare Iqbal, 129 S.Ct. at 1948 (claim of invidious discrimination requires the plaintiff to “plead and prove that the defendant acted with discriminatory purpose”), with Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir.1995) (government conduct that is “arbitrary, conscience-shocking, or oppressive in a constitutional sense” violates substantive due process). The complaint contains more than sufficient factual allegations detailing these deprivations. See Compl. ¶¶ 27-49.
Finally, it should not be lost on us that the Department of Homeland Security’s Office of Inspector General has itself confirmed the broad contours of Arar’s mistreatment, producing a lengthy report on the conditions of his detention in American custody. See OIG Report. This report provides a powerful indication of the reliability of Arar’s factual allegations at this stage.[6] Plainly, the majority has read the OIG report, even citing it for limited purposes in its opinion. See Maj. Op. at 578-79. It is difficult, then, to comprehend how the majority can ignore the report’s findings and conclusions in assessing the basic plausibility of Arar’s fourth claim.
Ultimately, it is unclear what type of allegations to overcome a motion to dismiss by high-level officials could ever satisfy the majority. In refusing to credit Arar’s allegations, the majority cites the complaint’s use of the “passive voice” in *619 describing some of the underlying events. See Maj. Op. at 570. This criticism is odd because the occasional use of the passive voice has not previously rendered pleadings defective, particularly where the defendants’ roles can be easily ascertained from the overall complaint. See Compl. ¶¶ 14-22; Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 561 (2d Cir.1985) (“It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader.”) (citations omitted). Specifically, the majority faults Arar for not pinpointing the individuals responsible for each event set out in the complaint and for failing to particularize more fully when and with whom they conspired. The irony involved in imposing on a plaintiff — who was held in solitary confinement and then imprisoned for ten months in an underground cell — a standard so self-evidently impossible to meet appears to have been lost on the majority.
The flaws in the majority’s approach are not unique to Arar, but endanger a broad swath of civil rights plaintiffs. Rarely, if ever, will a plaintiff be in the room when officials formulate an unconstitutional policy later implemented by their subordinates. Yet these closeted decisions represent precisely the type of misconduct that civil rights claims are designed to address and deter. See Carlson v. Green, 446 U.S. 14, 21, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Indeed, it is this kind of executive overreaching that the Bill of Rights sought to guard against, not simply the frolic and detour of a few “bad apples.” The proper way to protect executive officials from unwarranted second-guessing is not an impossible pleading standard inconsistent with Rule 8, but the familiar doctrine of qualified immunity.
Even if the majority finds that Arar’s factual allegations fall short of establishing the personal involvement of Defendants Ashcroft and Mueller, they plainly state a claim against defendants such as Thompson, Blackman, McElroy, and John Doe FBI and ICE agents. See Compl. ¶¶ 43, 47-48, 55. The direct involvement of these defendants is barely contested by the appellees and barely mentioned by the majority. For this reason alone, there is no legal justification for the majority to dismiss Claim Four outright.
IV
When the full range of alleged mistreatment is considered, Arar’s injuries hardly constitute a “new” context for Bivens claims, and I agree with both Judge Sack’s and Judge Pooler’s careful analyses. This Court has repeatedly assumed that Bivens extends to substantive due process claims and provides a damages remedy to other detainees illegally injured by executive officials or their agents. See Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); Thomas v. Ashcroft, 470 F.3d 491, 497 (2d Cir.2006); Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir.2000). Our State Department is of the same view, having assured the United Nations’ Committee Against Torture that a Bivens remedy is available to torture victims. See United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (bullet-point 5) (Apr. 28, 2006), available at http://www. state.gov/g/dr]/rls/68554.htm.[7]
*620 Even if Arar’s case were viewed as a new context, the “special factors” cited by the majority do not justify denying him relief because they are not “special.” They largely duplicate concerns — like state secrets, sovereign immunity, and qualified immunity — amply addressed by other doctrines at the Court’s disposal. See Davis v. Passman, 442 U.S. 228, 246, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (refusing to hesitate where special factors were “coextensive with the protections afforded by the Speech or Debate Clause”). My colleagues make these arguments in greater detail, cataloging the flaws in the majority’s Bivens analysis. I write to emphasize the heightened need for a Bivens remedy in cases such as this where executive officials have deliberately thwarted the remedies provided by Congress and obstructed access to the courts. Arar’s claims in this regard supply an exceptionally compelling justification for affording a Bivens remedy, going well beyond the allegations that gave rise to Bivens in the first place.
The judicial role recognized in Bivens reflects an important institutional balance — one closely aligned with separation of powers. Bivens offers Congress the first opportunity to fashion a remedy for invasions of individual rights protected by the Constitution. However, when a legislative judgment is lacking, Bivens permits the courts to use their common-law powers to fill crucial gaps and provide redress in appropriate instances. This line of cases thus instructs the courts to tread lightly where Congress has spoken, presuming that in those instances constitutional interests have been adequately addressed by the legislative branch. See Schweiker v. Chilicky, 487 U.S. 412, 423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (“When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional Bivens remedies.”).
On the other hand, where no legislative remedy exists, Bivens reaffirms the courts’ power to ensure that individuals can obtain relief for constitutional injuries. The courts, within this framework, provide a forum of last resort; through Bivens, they stand behind constitutional guarantees neglected by the political branches. Compare Bivens, 403 U.S. at 410, 91 S.Ct. 1999 (Harlan, J., concurring) (implying a remedy where constitutional injury would otherwise go unredressed), with Bush v. Lucas, 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (denying Bivens remedy in light of the “elaborate remedial system” established by Congress).
Even so, this remedy is constrained by “special factors” that counsel hesitation even in the “absence of affirmative action by Congress.” Bivens, 403 U.S. at 396, 91 S.Ct. 1999. The Supreme Court has never provided an exhaustive definition of these special factors, and existing precedent offers only a few data-points.[8] But it has *621 nonetheless indicated that this analysis should “weight] reasons for and against the creation of a new cause of action, the way common law judges have always done.” Wilkie v. Robbins, 551 U.S. 537, 554, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007). In Wilkie, for example, the factor that ultimately counseled hesitation was the difficulty of distinguishing unconstitutional conduct from lawful government activity. Id. at 555-61, 127 S.Ct. 2588. In earlier cases, involving claims by military personnel, the Supreme Court cited Congress’ plenary authority “To make Rules for the Government and Regulation of the land and naval Forces,” and its adoption of the Uniform Code of Military Justice. See Chappell v. Wallace, 462 U.S. 296, 301-03, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (citing U.S. Const. art. I, § 8, cl. 12-14; 10 U.S.C. § 938); see also United States v. Stanley, 483 U.S. 669, 683-84, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987). Where Congress, pursuant to this authority, had established a parallel system of military discipline, the Court declined to interfere in the relationship between enlisted personnel and their commanding officers. See Chappell, 462 U.S. at 304, 103 S.Ct. 2362. “Special factors,” then, must be regarded as a prudential limitation: One that considers the suitability of money damages for the particular constitutional injuries alleged, together with the availability of other relief.[9] See Davis, 442 U.S. at 245, 99 S.Ct. 2264 (finding “special concerns” overcome by impossibility of equitable relief and appropriateness of damages remedy).
So limited, Bivens is an infrequent remedy, but it is a vitally necessary one. In laying out the Bivens remedy, the Supreme Court recognized that “[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws.” Butz v. Economou, 438 U.S. 478, 485, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (quoting Bivens, 403 U.S. at 395, 397, 91 S.Ct. 1999); see also Davis, 442 U.S. at 241, 99 S.Ct. 2264 (“[T]he judiciary is clearly discernible as the primary means through which these rights may be enforced.”). It was this principle, in the face of “the most flagrant abuses of official power,” that prompted the Court to afford a damages remedy. Bivens, 403 U.S. at 410, 91 S.Ct. 1999 (Harlan, J., concurring). Bivens thus reflects the courts’ role as an independent source of protection, applying the damages remedy as a form of individual relief and official accountability.
This prerogative is consistent with the constitutional plan. With its built-in limitations, Bivens has never represented a formidable expansion of judicial power. *622 The doctrine, it must be remembered, does not create any new rights; it provides a mechanism for enforcing existing constitutional rights when no other avenue exists. “[WJhere legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.” Bell v. Hood, 827 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946); see also Bivens, 403 U.S. at 395, 91 S.Ct. 1999 (“Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty.”).
Against this backdrop, the majority sets out to narrow Bivens to the point of vanishing. The majority’s test would not just eliminate a Bivens remedy in Arar’s case, but in almost all cases. According to the majority, “ ‘[hjesitation’ is ‘counseled’ whenever thoughtful discretion would pause even to consider,” and “no account is taken of countervailing factors.” See Maj. Op. at 574. But because “thoughtful” people, by definition, always “pause to consider,” this approach would foreclose a damages remedy on account of the most fleeting and superficial of concerns. And it would permit courts to ignore completely, as the majority opinion itself does, the gravity of the constitutional injuries alleged. As the Court admits, this dramatic recasting of Bivens is unnecessary to support its holding. Id. at 574-75 (expressing the view that Arar’s action “would have the natural tendency to affect diplomacy, foreign policy and the security of the nation,” and therefore the Court’s holding “need be no broader”). The standard described by the majority misstates the law and, for the reasons surveyed here, significantly weakens the courts’ ability to redress constitutional injuries.
Y
Arar’s claims, in fact, go beyond the usual imperatives for a Bivens remedy. His complaint offers an exceptionally compelling basis for relief, one that the majority repeatedly sidesteps: The charge that government officials actively obstructed Arar’s access to the courts, violating core procedural due process rights. See Tellier v. Fields, 280 F.3d 69 (2d Cir.2000) (assuming that a Bivens action exists for procedural due process claim by detainee). Any court should be deeply disturbed by such allegations, especially those backed by the factual detail presented here. Cf. Valverde v. Stinson, 224 F.3d 129, 133-34 (2d Cir.2000) (finding AEDPA statute of limitations equitably tolled where prison officials intentionally obstructed habeas petitioner’s ability to file his petition by confiscating his legal papers). Yet the majority’s wholesale dismissal of claims relating to Arar’s detention in the United States — for insufficient pleading, as described above — allows it to avoid any meaningful engagement with these allegations.
Normally, as we have seen, when Congress legislates in a particular area, a Bivens action is not appropriate. In particular, the division of labor outlined in Bivens contemplated two scenarios: (1) Where Congress has selected a remedy for constitutional injuries, the courts should defer to its legislative wisdom; (2) Where Congress has not considered a remedy, however, a court must use its “judgment about the best way to implement a constitutional guarantee.” Wilkie, 551 U.S. at 550, 127 S.Ct. 2588; see Bivens, 403 U.S. at 396-97, 91 S.Ct. 1999. However, Arar’s case fits neither situation. Instead, the allegations are that any remedy provided by Congress and the Constitution was purposefully foreclosed by executive officials.
When it comes to torture, Congress has spoken loudly and clearly. Title 18, Sec *623 tion 2441 makes it a felony punishable by life imprisonment to commit, or conspire to commit, “an act specifically intended to inflict severe physical or mental pain or suffering ... upon another person within his custody or physical control for the purpose of obtaining information or a confession.” See also 18 U.S.C. § 2340A. Arar’s transfer to Syria was allegedly designed to skirt the congressional prohibition on torture by outsourcing this form of interrogation. Moreover, in order to seamlessly accomplish this transfer, officials had to ignore or evade a number of other congressional dictates: An immigration policy that bars the removal of any person to a country where he will likely be tortured, and the INA’s judicial review provision. See Convention Against Torture, December 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T. S. 85, implemented by Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105-277, Div. G., Tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231); 8 U.S.C. § 1252(a)(2)(D); see also Tun v. INS, 445 F.3d 554, 566 (2d Cir.2006). Finally, officials’ actions also foreclosed Arar’s opportunity to seek habeas relief under 28 U.S.C. § 2241 and the Constitution, a remedy that the government itself concedes should have been available to Arar.
In bare terms, the complaint alleges that executive officials set out to circumvent and undercut the powers of both the legislative and judicial branches. Under these circumstances, the usual justifications for hesitation in applying Bivens are simply not present. When, as here, the executive branch takes measures incompatible with the express or implied will of Congress, its “power is at its lowest ebb.” Youngstown, 343 U.S. at 637, 72 S.Ct. 863 (1952) (Jackson, J., concurring). Factors that might otherwise counsel hesitation disappear where executive officials have sought to nullify the remedies chosen by Congress. In these cases, courts owe the executive branch little deference. Instead, the courts’ provision of a substitute remedy is an undertaking not simply “appropriate for a common-law tribunal” but essential for the rule of law. Bush v. Lucas, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). Since the majority fails in these responsibilities, I respectfully dissent.

. See United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (bullet-point 5) (Apr. 28, 2006), available at http://www.state.gOv/g/drl/ rls/68554.htm; United States Report to the United Nations Committee Against Torture, ¶¶ 51 (bullet-point 5), 274, U.N. Doc. CAT/C/ 28/Add5 (Feb. 9, 2000), available at http:// www.state.gov/documents/organizatioiV100296.pdf.

. In Little v. Barreme, 6 U.S. (2 Cranch) 170, 179, 2 L.Ed. 243 (1804), for example, the Supreme Court found a naval captain "answerable in damages” for his unlawful seizure of a Danish trading ship, even where a Presidential order appeared to authorize the seizure. The Court did not hesitate, as here, to address the legality of the President's order or the seizure itself. "A commander of a ship of war of the United States, in obeying his instructions from the President of the United States, acts at his peril. If those instructions are not strictly warranted by law he is answerable in damages to any person injured by *614 their execution.” Id. at 170; see also Talbot v. Seeman, 5 U.S. (1 Cranch) 1, 2 L.Ed. 15 (1801) (determining the legality of the navy's capture of foreign merchant vessel during undeclared conflict with France); The Prize Cases, 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1862). Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866), rejected the government's claim that civil war authorized the executive branch to act as "supreme legislator, supreme judge, and supreme executive.” William H. Rehnquist, All the Laws But One: Civil Liberties in Wartime 121 (1998) (quoting the government’s brief in Milligan). "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances.” Ex parte Milligan, 71 U.S. at 120-21.

. The majority identifies extraordinary rendition as the context for Arar’s Bivens claims, a label that reduces the complaint to the fact of his transfer to Syria. See Maj. Op. at 563-64, 572-73. In doing so, the majority largely disregards the events both before and after Arar’s transfer that are part and parcel of his claim for relief. Arar does not merely allege that he was rendered to Syria without process, but that he was first detained in the United States for twelve days, during which time he was held in harsh and punitive conditions, coercively interrogated, and deliberately denied access to counsel, his consulate, and the courts by American officials. See Compl. ¶¶ 2, 4, 32-49, 91-93. Moreover, the purpose and culmination of this mistreatment was not simply Arar's removal from the United States. Rather, American officials allegedly set out to render him to Syria either intending or knowing that Arar would be tortured there, and aided this abuse by providing information to his captors. See id. ¶1¶ 55-57. One hopes that all extraordinary rendition is not for the purpose of torture; certainly, this abuse is not one of the attributes that the majority attaches to that label. See Maj. Op. at 564 n.l. All told, extraordinary rendition is the method by which Arar was transferred to Syria, but it hardly captures the constitutional injuries described in his complaint.

. At the time of Arar's detention, Defendant Ashcroft was Attorney General of the United States; Defendant Thompson was Deputy United States Attorney General; Defendant Robert Mueller was the Director of the Federal Bureau of Investigation (FBI); Defendant Ziglar was Commissioner of the Immigration and Naturalization Service (INS); Defendant Blackman was Regional Director of the INS for the Eastern District; Defendant McElroy was District Director for the INS for the New York City District; and John Does 1-10 were federal law enforcement agents employed by the FBI or INS. See Compl. ¶¶ 14-22.

. Likewise, the majority finds these very same allegations sufficient for purposes of personal jurisdiction, as did the panel. See Maj. Op. at 567-68; Arar v. Ashcroft, 532 F.3d 157, 173-75 (2d Cir.2008) (panel op.) (applying identical personal involvement standard in considering personal jurisdiction and finding it met).

. In Iqbal, the Supreme Court looked beyond the complaint to a wider factual context in assessing plausibility. See 129 S.Ct. at 1951— 52.

. Responding to the Committee’s question, "What guarantees and controls does [the United States] have to ensure the monitoring of the activities of law enforcement officials in prisons and other detention centres ... under its jurisdiction or de facto control,” the State Department acknowledged among other remedies: "Suing federal officials for damages under provisions of the U.S. Constitution for 'constitutional torts,’ see Bivens v. Six Un *620 known Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).”

. While the majority pointedly notes that the Supreme Court has only agreed to extend a Bivens remedy three times since 1971, it has only rejected such claims based on special factors on three occasions over that same period. See Wilkie v. Robbins, 551 U.S. 537, 554, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007); United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). In every other case, the Court has determined that the remedial scheme established by Congress displaces a judicial remedy — a finding that the majority does not purport to make here. Moreover, even in Chappell, the Supreme Court relied in *621 part on the alternative remedial scheme provided in the Uniform Code of Military Justice.

. The special factors analysis considers the wisdom and effectiveness of one particular remedy — the recovery of money damages from individual federal officers. This determination is separate and distinct from (1) a court’s capacity to assess the right in question; and (2) its power to afford relief of any kind. In particular, if a court would be entitled to provide injunctive or habeas relief for the same or similar claims, it cannot treat the special factors analysis as a proxy for justiciability, the political question doctrine, or the separation of powers. Indeed, if other forms of relief would be available, these potential obstacles to the court's jurisdiction have already been dispatched and they may not be smuggled in a second time through the back door. Yet the majority does precisely this, relying on a host of "special factors” that simply repeat concerns accounted for elsewhere in our law. See Maj. Op. at 574-79 (treating as special factors separation of powers, sovereign immunity, state secrets and classified information, and diplomatic assurances). In reality, it is a much more modest inquiry. The special factors analysis must focus on why money damages — as opposed to other forms of available relief — might be inappropriate or undesirable.